178 Ga. App. 235 (1986)
342 S.E.2d 715
IN RE L. L. B.
71827.
Court of Appeals of Georgia.
Decided February 25, 1986.
Rehearing Denied March 11, 1986.
Janice Y. Martin, Mary R. Carden, Phyllis J. Holmen, Imogene L. Walker, for appellant.
Michael J. Bowers, Attorney General, H. Perry Michael, First Assistant Attorney General, William C. Joy, Senior Assistant Attorney General, Richard J. Joseph, David C. Will, Assistant Attorney *239 General, for appellee.
BANKE, Chief Judge.
This is an appeal from a juvenile court order terminating the appellant's parental rights with respect to her two-year-old daughter, L. L. B.
The appellant gave birth to the child at the age of 15, while living with her parents. The identity of the father has not been conclusively determined. When the child was two months old, the appellant took her to the emergency room of the South Georgia Medical Center because she was not gaining weight. The Department of Family and Children Services (DFCS) became involved in the case at this time at the request of the attending physician, who was concerned that the child's lack of weight gain might be attributable to improper care.
Upon being released from the hospital, the child was returned to the custody of the appellant but under the supervision of the DFCS, which assigned a caseworker and a "chore homemaker" to the case, both to monitor the situation in the home and to assist the appellant in caring for the child. The DFCS personnel also enrolled the appellant in a health department program which enabled her to receive formula and baby food free of charge. However, the child's condition did not significantly improve over the course of the following month; and at the end of that period she was consequently admitted to Henrietta Egleston Hospital in Atlanta for further tests. The child was again released to the appellant's custody a month later, subject to a complex regimen of medication, involving five different drugs to be administered as often as four times a day. The child's condition still did not stabilize, however; and the following month the DFCS consequently sought and obtained from the juvenile court an emergency shelter care order giving it immediate custody of the child. This decision was reaffirmed by the juvenile court following a subsequent temporary custody hearing.
After the temporary custody order was entered, the physicians treating the child finally diagnosed her arrested development as resulting from proponic acidemia, a rare, incurable genetic defect which prevents the body from breaking down and assimilating normal amino acids, or proteins. The child remained in foster care for a period of nine months, with monthly to twice monthly visitation by the *236 appellant. At the end of that period, the DFCS filed the present action to terminate the appellant's parental rights.
Asked at the hearing on the termination petition to explain why she had thought it necessary to place the child in foster care, the DFCS caseworker assigned to the case testified as follows: "The baby was still not continuing to grow and to progress like she should have. The blood tests were coming back. We would get calls and saying the blood tests  we need to go out and have her increase this medication or get some more of this medication  so, the blood tests were never stabilized the entire time that she was home from Atlanta. The baby was out of food at least on two occasions, and was out of food the day that we placed her in foster care. The family had gone to the health department that day, asking if they had food for the baby. The baby also was out of medication on several occasions. The baby was on five medications. Three of those meds were paid for by Medicaid and two were not. Now, the two of these that were not would run approximately $15  $20 per month. And, the family would get the medication that was on Medicaid, but they would not get the medication that was not on Medicaid, because they wouldn't have the money to pay for it. So, it was just a combination of we knew we were dealing with a child that was very serious  illness. The child was still at about four to five months old, still weighed about 7 lbs. or in that neighborhood. And, without the medication, the doctors advised us that she could not  and we felt it was a life-threatening situation."
A pediatrician familiar with the child's condition summarized her medical and nutritional needs and described the potential consequences of lack of proper treatment as follows: "She has to be well-monitored medically, very closely. She also has to be on a tremendous regime of medication . . . The child would also be on a protein restricted diet. The more protein, which would be amino acids, you put into the body . . . the more that you have to break down, which she can't. So, then that would be an increase in the acids  the proponic acids in the body and the other bi-products." Asked if such an increase would be potentially lethal, the witness responded: "Well, lethal in a sense that they make you very sick. You throw up, you're very lethargic . . . You would eventually die from it. You would  if it was just let go and never treated, yes, you would die from it."
A clinical psychologist who had examined both the appellant and the child characterized the appellant as having an IQ of 74, which he described as "sort of halfway between retarded and normal"; and, while stating that the appellant did not suffer from any mental disorder or personality aberration, he assessed her as being "somewhat of a pre-teen emotionally . . . frivolous, very high interest in pre-adolescent activities, rather than mothering activities." Asked to explain a statement in his report to the effect that the appellant appeared "unconcerned," *237 he testified: "She hasn't accumulated any information, and she's not dumb. So she's got this baby that everyone is hand-wringing over and telling them  telling her that this is a very, very sick child; and she doesn't know anything about that at all. Maybe `unconcerned' is a little harsh, but it's  she's very frivolous. And she talks about that all the baby needs is warmth, and hugging, and playing with, and she could do all that. . . . [H]er interests are the kind of interests that you would see in a normal 13-year-old girl. And as that, it's not that she's terribly unconcerned; it's that she is the mother of a severely disabled child. She wants to just play house and have a doll." He further testified: "She can't come within fifty percent error estimating her child's size, thought the child was sort of average, and doesn't have any concept at all of the fragileness of the child, or has no knowledge of the medication, the diet, or the special foods."
Regarding the issue of the appellant's ability to care for the child, the psychologist testified as follows: "[M]y sense is that she is no way capable of managing a regimen that's as unforgiving as the one that is prescribed for this child in which you have got at least a three-dimensional problem of trying to balance natural diet so that you don't let these children come in contact with what would be a poisonous food, which would just be a normal protein, which that's what we eat. That's what we build our body with, and that's what kids want. That is, kids that are protein deficient are out there banging on the world trying to find protein. A very complicated synthetic diet and extremely difficult medical protocol. And, you know, I'm caught between: here is essentially a normal mother, except for her immaturity, and except for her just lack of sharpness and brightness, and here is basically a normal child. And yet, if you were to give this child back to this mother in any foreseeable future, I think she would kill the child. And I think she would be as bewildered as anyone else as to how did this happen. She just does not have the almost paranoid vigilance that you would hope for, say, a mother of a hemophilic child where they are just  just constantly vigilant from daylight to dark. This doesn't require a normal mother. This doesn't require  it requires a mother that is super-normal, and it requires a mother that is hyper-vigilant, and it requires a mother that is other-focused, looking at other people all the time. And she lets up, the baby will die." Held:
By its terms, OCGA § 15-11-51 (a) (2) permits termination of parental rights with respect to a child if "[t]he child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." However, both this court and the Supreme Court have held that to authorize a complete termination of parental rights based on deprivation, the deprivation must be established *238 by clear and convincing evidence to have resulted from parental unfitness, i.e., some misconduct or incapacity on the part of the parent. See Blackburn v. Blackburn, 249 Ga. 689, 694 (292 SE2d 821) (1982); Chancey v. Dept. of Human Resources, 156 Ga. App. 338, 340 (274 SE2d 728) (1980); In the Interest of S. M., 169 Ga. App. 364, 365-366 (312 SE2d 829) (1983). "A finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere. (Cit.) Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child relationship." Carvalho v. Lewis, 247 Ga. 94, 95 (274 SE2d 471) (1981).
Quite clearly, there is no evidence of any parental misconduct on the part of the appellant in this case. To the contrary, all the evidence indicates that she is a loving parent who would never intentionally do anything to harm her child. However, this is not a case wherein the DFCS has chosen to intervene merely on the basis of a determination that better financial, educational or moral advantages might be available to the child elsewhere. Compare In re Suggs, 249 Ga. 365 (291 SE2d 233) (1982); Ray v. Dept. of Human Resources, 155 Ga. App. 81 (270 SE2d 303) (1980); Shover v. Dept. of Human Resources, 155 Ga. App. 38 (270 SE2d 462) (1980); Chancey v. Dept. of Human Resources, supra. Rather it is a case in which, due to a rare, incurable metabolic deficiency, the child requires an extremely high level of special care and attention for its very survival, a level of care and attention which the evidence clearly and convincingly demonstrates that the appellant, well-intentioned though she may be, is mentally and emotionally incapable of providing. Based on such evidence of lack of capacity, we must conclude that the juvenile court was authorized to terminate the appellant's parental rights with respect to the child.
Judgment affirmed. Birdsong, P. J., and Sognier, J., concur.