A89A1266. IN THE INTEREST OF E. P. N., a child.
(388 SE2d 903)

BIRDSONG, Judge.

This is an appeal by appellant natural mother from the order of the Cherokee County Juvenile Court terminating her parental rights in her son, E. P. N. E. P. N. (hereinafter "child") was born in April, 1982.

### I. Case History

Appellant has given birth to four children. In addition to E. P. N., one child has been adopted by a non-family member, one child was adopted by its natural father, and one child was adopted by appellant's sister. On April 25, 1984, appellant voluntarily placed the child with the Department of Human Resources (DHR) for a three-month period that was extended for three months. Subsequently, DHR petitioned for temporary custody of the child, but the petition was denied.

On February 4, 1985, the child was returned to appellant, but the

next day appellant contacted the foster parents and asked them to babysit for the child as her babysitter arrangements had failed to materialize. The foster parents took care of the child for approximately one of the next three weeks. Appellant thereafter informed the foster mother that she was financially unable to care for the child, and that the child was not adjusting. Appellant again voluntarily placed the child with DHR for another six-month period. During this time, the child remained with the foster parents.

On August 26, 1985, DHR was given temporary custody of the child, and the child has remained in such custody in the foster parents' home since that date. On March 13, 1986, DHR filed a petition to terminate appellant's parental rights. At this time, appellant had not visited the child since December 21, 1985. On September 4, 1986, the juvenile court continued the case for approximately six months, but issued an order finding that the "child continues to be deprived," ordering appellant to make weekly payments of $40 (which payments were generally made through March 1987), ordering at least two visits with the child per week, ordering psychological examination of appellant, and continuing temporary custody by DHR for two years.

On February 5, 1987, a Consent Temporary Order was filed. The order continued custody in DHR until August 1988, continued the $40 per week support payments, and required at least weekly visits between appellant and child to be conducted outside the foster home. The order did not dismiss the petition for termination of parental rights. The juvenile court specifically determined in its final order terminating parental rights that the only requirement appellant complied with was the requirement for psychological evaluation. The last support payment appellant is shown to have made was tendered on March 23, 1987. Also, in early 1987, appellant only visited the child occasionally, and did not visit or contact the child on his birthday.

On August 5, 1987, DHR renewed its motion for termination of appellant's parental rights. On October 9, 1987, the juvenile court issued a temporary order finding that appellant had not exercised her visitation privileges since April 4, 1987, nor paid support since March 23, 1987. The court further found that the child continues to be deprived, directed that $40 per week support payments continue, altered visitation requirements to only those requested by appellant, ordered that the child remain in the temporary custody of DHR (through Cherokee County Department of Family & Children Services), and ordered a current psychological examination of appellant. On April 21, 1988, the juvenile court issued an order, amending the conclusions of law contained in its order of August 26, 1985, and concluding inter alia that based on clear and convincing evidence the said child is deprived and that continuation in the home would be contrary to the welfare of the child.

On June 9, 1988, the juvenile court issued an order denying termination of parental rights on the grounds that the requisite showing of harm had not been made as required by *In the Interest of C. T.,* 185 Ga. App. 561 (365 SE2d 117). In this same order the court found as fact that appellant "suffers from a mental disability which is severe and of long standing duration. This mental disability has not thus far changed or improved since 1984 to enable the mother to care for the child. . . . There is no bonding of the parent and child despite the fact that there [has] been sufficient contacts between the two to establish a bond." The court also found that the child continues to be deprived, placed the child in the custody of DHR, and incorporated prior visitation and support order terms by reference.

DHR filed a motion for reconsideration, which was granted. An additional hearing was conducted, and Dr. Schenk, a clinical psychologist, gave further testimony regarding the harm the child was likely to suffer in the event parental rights were not terminated. On October 13, 1988, the trial court entered an interlocutory or intermediate order finding "the continued foster care placement to be harmful to the child and that a permanent placement can only be achieved through termination of parental rights," and "that continued foster care placement, of an indefinite duration, is sufficiently harmful in and of itself to meet the requirement of harm to the child."

On November 23, 1988, the juvenile court issued a final Order Terminating Parental Rights. This order contained detailed findings of fact, including inter alia the following: "Only the psychological examinations have been fully complied with" regarding the specific conditions and requirements of the consent temporary order of February 1987. "There is significant failure by [appellant] to comply with the [c]ourt ordered plan of August 8, 1986. . . . By the time of the hearing date, only forty per cent of the amount [of child support] ordered had been paid. . . . The last date when actual support was paid was March 23, 1987. . . . This [c]ourt ordered [appellant] to have regularly scheduled visitation with the child, that is, at least twice a week. Out of the 136 possible visits only 32 were actually carried out. No justifiable reason was given by [appellant] as to her failure to visit. . . . *The Court . . . finds clear and convincing evidence based on the facts in this case that there is a medically verifiable deficiency of [appellant's] mental or emotional health* of such duration or nature as to render her . . . unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child. . . . *The [c]ourt further finds that based on clear and convincing evidence that the continued deprivation of the above child will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.* . . . The [c]ourt finds based on clear and convincing evidence that the above child's need for bonding and per-

manency outweigh any reason or purpose in continuing the parental ties with the natural mother and, further, *that termination of parental rights is necessary for the child's physical, mental, emotional health and morals.*" (Emphasis supplied.)

## II. Operative Facts

The evidence in this record includes the following: Dr. Paul Schenk, a clinical psychologist, testified that his evaluation of the child revealed that appellant "was more of a non-person in [child's] life." It was more of "an absence of a relationship." The likelihood of the child feeling closer to appellant or attempting to bond with her "approaches zero given that [child] has been in a family for several years now and clearly seems to view the foster parents as his functioning parents." Under the existing conditions, it would be "unhealthy" for the child and not in his best interests to move back with the birth mother, and this situation is not expected to change in the short term. At the follow-up hearing conducted after DHR's motion for reconsideration was granted, Dr. Schenk gave the following additional testimony. Because the child lacks a stable, permanent relationship he will, at least unconsciously, test repeatedly to see if he is a member of his foster family. The child needs stability. He has a non-relationship with his mother (appellant), so no emotional benefits accrue to him keeping her name. It is reasonable to expect that the child will be *harmed* by having this no-benefit, non-relationship with appellant; particularly, "it would be very reasonable to expect to see *emotional harm* to [child] as he continues to grow." (Emphasis supplied.) Some of the likely outward manifestations of such harm may include: "the possibility of testing the limits"; "the sense of being somewhat of an outsider in his social network that can influence how he sees himself fitting into his peer group" (which impacts on esteem and self-image); the child could gravitate to "counter-culture" friends to belong among those who do not belong; "[i]t would be easy to see school performance being affected as one of those issues"; and "[y]ou could see it showing up in experimentation with drug use . . . as a way of blocking awareness of the issue that is unpleasant for them." Dr. Schenk concluded that he "would anticipate that there would be emotional harm occurring to [child]" if the termination of parental rights is not granted; however, he did concede that it is impossible to rule out that the child could continue in his current situation and still develop as an adjusted person.

Ms. Daughtery, foster mother, testified regarding the adjustment the child had made to her home; the sporadic visits of appellant to the child; and of the lack of any real affection being displayed during these visits between child and appellant.

Ms. Gayle, Cherokee County Department of Family & Children Services, testified that the agency could be of no further help with appellant in view of appellant's lack of cooperation and feelings of paranoia toward the agency. She testified in detail as to the chronology of events leading to termination. Ms. Gayle observed certain visits between the child and his mother. She observed no affection demonstrated between the two; there "was no . . . love shown between them." On the very last visit, appellant "walked down the hall, didn't say good-bye, she didn't hug [the child] or kiss him or anything." At an earlier time, appellant had been hospitalized due to a suicide attempt. Ms. Gayle further testified that the child "does deserve a permanent plan for his life," and that no further progress can be made to unite the child with its mother. Ms. Gayle stated that the child needs "security and permanency in his life," and that she can see "no benefit" whatever to the child and harm to him in continuing to live in foster care and being visited by his biological mother.

Dr. DeFilippis, clinical psychologist, evaluated appellant on three occasions, the last being on October 13, 1987. In that evaluation, he diagnosed appellant as having a "Schizotypal personality disorder." He testified that his diagnosis was "a character disorder, personality problems which are long term and involved a lot of paranoid type behavior. People with those kinds of problems are very difficult to treat if not impossible. [He does not] see much change occurring in her." Although from time to time she may become more stable and more able to cope, the problems remain. He does not believe that she has a "treatable mental [condition]." He believes there exists no strong bond between appellant and her son. He observed signs during each mental examination of "significant problems," and appellant has evidenced some "paranoid thinking." Appellant never expressed a definite desire to have the child returned to her and could not articulate why she did not want her parental rights terminated. Continued parental relationship would prevent the child from being adopted and obtaining a permanent stable situation. It is in the child's best interest to develop permanent bonds whether permanent foster or permanent adoptive bonds. Dr. DeFilippis also expressly testified that he believes that in the future something is "going to happen" to disrupt appellant and put her under stress. When that occurs, he thinks "it's likely that [appellant] might show very poor judgement [sic], might become very bizarre in her thinking, *and might even be potentially dangerous . . . making decisions that are so poor, that it would put her child in danger and herself.*" (Emphasis supplied.)

Appellant enumerates as error that the juvenile court lacked jurisdiction to terminate parental rights when it predicated its ruling on the possibility of an adoption; that the juvenile court improperly terminated parental rights to facilitate an adoption; and, that the juve-

nile court did not hear sufficient, clear and convincing evidence to justify a termination of parental rights based upon deprivation. *Held*:

1. Regarding appellant's first enumeration of error of lack of jurisdiction, the juvenile court clearly had jurisdiction over the subject matter in this case, that is, termination of parental rights. Appellant's assertions of lack of jurisdiction are without merit. OCGA §§ 15-11-1; 15-11-5 (a) (2) (c).

2. Appellant's remaining enumerations of error in essence concern the sufficiency of the evidence to support the trial court's order of termination of parental rights. On appeal, this court must construe the evidence most strongly to support a verdict and judgment, *McLarty v. Kushner*, 173 Ga. App. 432 (1) (326 SE2d 777), and every presumption and inference must be in favor thereof. *Worn v. Sea-Cold Svcs.*, 135 Ga. App. 256 (3) (217 SE2d 425).

(a) Notwithstanding the allegations contained in appellant's enumerations of error, review of the final order of the juvenile court in toto establishes that the trial court did not terminate appellant's parental rights on the *sole* ground of facilitating the child's adoption. Compare *In the Interest of J. L. G.*, 191 Ga. App. 904, 905 (383 SE2d 376).

(b) The facts of this case are substantially distinguishable from the facts of *In the Interest of C. T.*, supra. Particularly, in this record there clearly exists evidence from which it reasonably can be concluded that the child is in danger of suffering in the future physical, mental, emotional or moral harm due to the mere continuance of his relationship with appellant on a visitation basis. Moreover, unlike *C. T.*, the record contains evidence that termination of appellant's parental rights would enable the child to achieve a more stable home life through adoption or permanent placement, and that termination would have some beneficial impact on the situation. Compare *C. T.*, supra at 562.

(c) The record in this case includes evidence as to the necessity for stability in the child's life through termination of appellant's parental rights with the child. This type of evidence is analogous in effect to evidence of "foster drift." While evidence of foster drift is not alone sufficient to support termination of parental rights, the adoptability of the child and the child's needs for a stable home is "a factor in the determination of deprivation and continued deprivation." *In re G. M. N.*, 183 Ga. App. 458, 461 (359 SE2d 217); compare *C. T.*, supra at 562 (noting no evidence that termination would allow the children to achieve a more stable home life through adoption, which could provide a basis for termination). In this case there is evidence of appellant's lengthy and continued neglect of this child. A "lengthy and continuing neglect of . . . children, is sufficient to authorize the termination of appellant's parental rights" at least when coupled with

some other significant factor. *In the Interest of A. T.*, 187 Ga. App. 299, 301 (370 SE2d 48). Moreover, parental unfitness supporting a termination of parental rights can be caused " ' "either by intentional or unintentional misconduct resulting in abuse or neglect of the child or by what is tantamount to physical or mental incapacity to care for the child." ' " *In re N. F. R.*, 179 Ga. App. 346, 348 (346 SE2d 121). In this regard, OCGA § 15-11-81 (b) (4) (B) (i) provides that in determining whether the child is without proper parental care and control the court *shall* consider certain medically verifiable deficiencies of the parent's mental or emotional health. The resulting deprivation, however, must be shown " ' "likely to continue and likely to cause serious harm to the child." ' " *N. F. R.*, supra at 348.

" ' "The reviewing court is to defer to the lower court in the area of factfinding and should affirm unless the appellate standard of review . . . is not met." ' " *A. T.*, supra at 300. " '(T)he appropriate standard of appellate review . . . is whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody were lost. . . .' " *J. L. G.*, supra at 905; *In the Interest of J. A. B.*, 189 Ga. App. 79, 80 (374 SE2d 839); *In the Interest of J. L. Y.*, 184 Ga. App. 254 (1) (361 SE2d 246). We find that the evidence in this case could be so viewed, and that no basis exists for reversing the judgment of the juvenile court. Compare *In the Interest of A. O. S.*, 189 Ga. App. 860 (377 SE2d 870); *In re R. L. Y.*, 184 Ga. App. 69 (1) (360 SE2d 636); *In the Interest of T. R. G.*, 162 Ga. App. 177 (290 SE2d 523).

The dissent states that "there is no evidence in the record of any action on the part of appellant which has caused, or is likely to cause, harm to the child," and concludes the requirements of OCGA § 15-11-81 (b) (4) (A) (iv) were not met by clear and convincing evidence. Suffice it to say society now understands that the emotional harm to which a child can be subjected may be every bit as crippling in effect as physical harm. This record is replete with circumstantial evidence which clearly and convincingly establishes that E. P. N. was emotionally harmed and would likely be so harmed in the future by appellant. In fact, an expert testified that appellant "might even be potentially dangerous" to her child.

An appellate court determines sufficiency of the evidence; it does not weigh evidence or determine witness credibility. See generally *Horney v. Lawrence*, 189 Ga. App. 376 (3) (375 SE2d 629); *Work Clothes Outlet v. M & S Purchasing*, 188 Ga. App. 179 (1) (372 SE2d 509). The evidence in this case is sufficient, when viewed under the above discussed appellate standards, to affirm the trial court's ruling. It would be nothing short of draconian for this court to usurp the trial court's lawful functions by re-weighing evidence and re-deciding wit-

ness credibility, *when as a result we are subjecting this child to the likelihood not only of continuing emotional harm, but to a situation which in all likelihood might even be potentially dangerous.* This we decline to do. Our state constitution provides "[p]rotection to *person* and property is the paramount duty of government." (Emphasis supplied.) Ga. Const. of 1983, Art. I, Sec. I, Par. II. This constitutional right of protection extends equally to children as well as adults. "In the United States, the *parens patriae* function belongs with the states." Black's Law Dictionary (5th ed.), p. 1003. We should not pay mere "lip service" to this grave obligation by preserving in legal fiction an already harmful and deteriorated parent-child relationship.

*Judgment affirmed. Carley, C. J., Banke, P. J., Pope and Beasley, JJ., concur. Deen, P. J., McMurray, P. J., Sognier and Benham, JJ., dissent.*

BENHAM, Judge, dissenting.

I must dissent from the majority's opinion affirming the juvenile court's termination of appellant's parental rights. Based on testimony of a child psychologist that the mother is a "non-entity" in the child's life; that there is an absence of a mother-son relationship between the two; and that the child should be permanently placed so that he can develop stability, the trial court found by clear and convincing evidence that the continued deprivation of the child will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. I cannot agree that this testimony establishes by clear and convincing evidence the requisite harm under OCGA § 15-11-81 (b) (4) (A) (iv) inasmuch as there is no evidence in the record of any action on the part of appellant which has caused, or is likely to cause, harm to the child. Compare *In re G. M. N.*, 183 Ga. App. 458, 460 (359 SE2d 217) (1987) (evidence that the natural mother "drank heavily" and was "in and out of jail"); *In the Interest of J. M. K.*, 189 Ga. App. 140, 141 (375 SE2d 131) (1988) (evidence that the natural father left the children outside at 5:30 a.m. in the pouring rain); *In the Interest of A. T.*, 187 Ga. App. 299 (1) (370 SE2d 48) (1988) (evidence that the natural mother physically abused the child and withheld medical care). The danger which is inherent in the juvenile court's order is that the "harm" requirement under OCGA § 15-11-81 (b) (4) (A) (iv) can be met by merely establishing that the child is in an indefinite foster-care situation, without any showing that the parent whose rights are sought to be terminated forever has done anything, or is likely to do anything, to cause physical, mental, emotional, or moral harm to the child.

"Georgia law has consistently favored the preservation of the relationship between biological parents and their children" (*Murphy v. Suddeth*, 189 Ga. App. 212 (1) (375 SE2d 253) (1988)), and "[t]his

court has long recognized that termination of parental rights is a severe measure. [Cit.]" *In re N. F. R.*, 179 Ga. App. 346, 348 (346 SE2d 121) (1986). The court is authorized to consider, "as an element in continued deprivation under [OCGA] § 15-11-81 (a) (4), and as a matter of the child's best interest in its 'need for a stable and secure home' under § 15-11-81 (a), the severe detrimental effects of prolonged stay in foster care under the ephemeral hope of change but without the real prospect of parental improvement that would justify such a prolonged stay in foster care. . . ." *In re G. M. N.*, 183 Ga. App. 458 (1) (359 SE2d 217) (1987). However, "[a] court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere." *In re L. L. B.*, 178 Ga. App. 235, 238 (342 SE2d 715) (1986).

While giving due deference to the juvenile court as the trier of fact, I do not find that the requirement of OCGA § 15-11-81 (b) (4) (A) (iv) was met by clear and convincing evidence; therefore, I respectfully dissent.

I am authorized to state that Presiding Judge Deen, Presiding Judge McMurray, and Judge Sognier join in this dissent.

DECIDED NOVEMBER 30, 1989.

*Conrad & Abernathy, Steven M. Campbell*, for appellant.
*Michael J. Bowers, Attorney General, Carol A. Cosgrove, William C. Joy, Senior Assistant Attorneys General, Kipling L. McVay*, for appellee.