A91A1777. IN THE INTEREST OF J. R., a child.
(414 SE2d 540)

BEASLEY, Judge.

This is an appeal from the order of the juvenile court terminating the parental rights of the natural mother and father of J. R., a three-and-a-half-year-old boy. The court also placed physical custody with the maternal aunt and her husband. The claim is that the Department of Human Resources, acting by and through the local Department of Family & Children's Services (DFCS), failed to carry the evidentiary burden of showing clear and convincing evidence of present parental unfitness likely to continue and a corresponding detrimental effect on the child.

In parental rights termination cases, as in others, "[o]n appeal, this court must construe the evidence most strongly to support a verdict and judgment, [cit.] and every presumption and inference must be in favor thereof. [Cit.]" *In the Interest of E. P. N.*, 193 Ga. App. 742, 747 (2) (388 SE2d 903) (1989). " ' " "The reviewing court is to defer to the lower court in the area of factfinding and should affirm unless the appellate standard of review . . . is not met.' " ' [Cit.] ' "(T)he appropriate standard of appellate review . . . is whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing

evidence that the natural parent's rights to custody were lost. . . ." ' [Cits.]" Id. at 748 (2) (c).

The evidence construed in favor of the judgment included, but was not limited to, the following. The parents have five other living natural children in addition to J. R.; one is married and one is in military service. Until the recent death of the maternal grandmother, the three remaining teenage girls resided principally in the grandmother's home. The parents sporadically moved from the grandmother's house to one mobile home or another, some without adequate heating. The father was infrequently home with the children.

J. R. came to the attention of DFCS as an infant when J. R.'s then teenage brother became concerned about J. R.'s safety and took him to the home of a maternal aunt. The brother had been awakened by the infant's cries at 4:00 a.m. and discovered that the mother had left the child and the teenager alone in the mobile home. The brother went next door and found the mother on the neighbor's telephone trying to call her sister to come get her. The mother "was just out of her head talking crazy, hollering and screaming" and "saying that the boogie man was out there trying to get her." Just prior to this incident, the brother awoke one morning to find that the mother had taken his car. After going to town to attempt to locate the mother, the brother and father found the mother in jail for trying "to break in on a man." The only clothing the mother was wearing was a large skirt pulled up over her chest and extending down to her knees.

Custody of J. R. was placed in DFCS in August 1987 when J. R. was four months old; physical custody continued with the maternal aunt. At the hearing in August, the father told the caseworker that the mother was not capable of caring for J. R. The child has resided in the home of the maternal aunt for all but approximately two months of his life.

In September 1987 the sheriff's department requested a caseworker to go to a local grocery store to speak with the mother, who had been in the store for hours going in and out of it. The mother's speech was rambling. She talked about falling out of a truck the night before and kept looking for a bag of peanuts. She stated that she had not come to the court hearing on J. R.'s custody because "she was stuck out in the sticks and didn't have a way." When asked why her husband was able to come to the hearing, the mother stated that her husband brought a "school teacher" to the hearing and that he "wanted that school teacher to keep the baby."

At a subsequent hearing, the mother was again "rambling" and told the caseworker she "was wonderful with children," that "she had never been on drugs," that "the things people said about her were lies," and that she "was just going to consider her son [J. R.] dead." Even though it was then explained to the father that visitation with

the child was important, the father stated that he did not really want to visit with J. R. but would wait until the child could be with them all the time. The caseworker attempted to hand the infant J. R. to the father but the father acted like he did not want to take the baby. The father showed no sign of emotion in regard to the child.

At another hearing in November, the mother showed up wearing a "clown nose" and carrying a balloon. She was eventually taken out of the courtroom.

The following occurred during other contacts between the parents and DFCS. The mother accused other family members of being against her and putting drugs in her food. She accused one sister of trying to kill her. The mother spontaneously began to sing, stating that she wanted to make a tape and send it to Nashville. At one panel review, the mother became angry, waved her arms, and began speaking unintelligibly as if in a foreign tongue.

In April 1988, DFCS received a referral that the mother was five-and-a-half months pregnant with another child, diabetic, and not receiving prenatal treatment. When the caseworker visited, the mother related that a little bird came to her house, perched on a picture on the wall, and spoke with her. Several months later, DFCS visited after receiving a report that the mother had given birth to a baby and then buried it. The mother told the caseworker that the baby had been buried but would not locate the grave. Later, the mother related to the caseworker that the lost baby had been conceived as the result of her being raped two years before. The mother also told her sister that she had given birth to a baby girl, that the child had died, and that she had buried it in the yard. The mother took her sister and brother-in-law outside in the yard, showed them a small cross which had been erected, and stated that it was the baby's burial site.

The mother wrote several letters to DFCS workers describing a series of incredible events, including that her husband had been struck by lightning.

From the beginning of contact with DFCS, the parents were very evasive about where they were living; the caseworker felt that they were "just kind of roaming." In February 1988, DFCS lost contact with the parents and had no idea where they were. In August and September, the parents did not show up for visits with J. R. The parents did not visit J. R. from February 1988 until March 1989. Visitation resumed in March 1989 following a panel review at which DFCS stressed how important it was that the parents visit, that by not visiting it appeared that the parents did not care about J. R. During visitations, the father had very little to do with J. R.; sometimes the father would not even go in the room. The parents again failed to visit the child for a period of over a year, from December 1989 to January 1991.

The father was ordered to pay $50 per month for J. R.'s support. Although during much of the time the father was employed at a wage sufficient to pay the court-ordered support, the father refused to make any support payments during the entire period of J. R.'s custody with DFCS. The parents never brought or sent to J. R. any birthday or holiday gifts or cards even though they would do so for other family members.

From April 1985 to November 1987, the mother was hospitalized five times at Georgia Regional Hospital in Savannah. During that time she had been diagnosed as suffering from bipolar disorder, manic with psychotic features. She had a history of failure to keep mental health appointments and follow recommended treatment. Her husband more than once checked her out of Georgia Regional prior to the recommended release date. Although urged repeatedly and consistently by DFCS workers and mental health treatment providers that the mother needed mental health treatment, both the mother and father actively refused to pursue any continued treatment and denied the need for it.

A psychologist evaluated the mother in October 1987 and in May 1989. On these occasions she was found to suffer from bipolar disorder and in 1989 also exhibited a delusional (paranoid) disorder. This same psychologist again evaluated her on October 18, 1990 and testified as to his evaluation at the termination hearing.

The personal interview segment of the evaluation disclosed, inter alia, that the mother denied a history of chemical abuse and criminal convictions and the need for any treatment by a psychologist or psychiatrist. She also revealed that in the past her husband had beaten her but that such had not occurred in more than four years. Although the mother then did not exhibit gross psychotic symptoms, gross organic effects, or grossly disrupted cognitive processing, she did exhibit signs of possible cognitive loosening.

Psychological testing revealed "psychosocial immaturity, use of repression and denial as basic defenses, an unrealistic approach to life and its challenges, little in the way of aspiration or ambition,, and a naive, simplistic view of her role in life as a parent and/or adult." The overall level of demonstrated intellectual functioning was within the low average range. It was suggested that the mother might "have a difficult time organizing cognitive processing consistently because of anxiety, tension, and interference from disruptive cognitions, possibly delusional." Such results were not inconsistent with those obtained in 1987 and 1989. One test presented an invalid profile because of the mother's deliberate denial of even minor personal difficulties experienced by virtually all individuals.

A parenting skills inventory showed that the mother "has limited awareness of the medical needs and developmental milestones of chil-

dren," marked deficiencies in the area of child discipline and communication with children, and underdevelopment of her ability to understand children's feelings. It was concluded that she could benefit greatly from parenting skills classes.

In summary the psychologist concluded, inter alia, that behavioral observation at different junctures disclosed solid evidence of cognitive slippage and loosening, relatively ineffective psychological defenses with a significant potential for deterioration, even decompensation into psychosis. The prognosis was "guarded." It was recommended to the court that before the mother be granted custody of J. R. she become involved in individual counseling or psychotherapy and satisfactorily complete classes in parenting skills.

Even at the termination hearing, both parents denied the mother had any psychological or psychiatric problems and were resistant to obtaining mental health treatment. The mother reaffirmed her belief that her sister had tried to kill her by putting drugs in her food.

In considering the termination of parental rights, the court must undertake a two-step analysis. It must first determine whether there is clear and convincing evidence of parental misconduct or inability as provided in OCGA § 15-11-81 (b) and then if there is such evidence of misconduct or inability, whether termination of parental rights is in the best interests of the child. OCGA § 15-11-81 (a). "[T]hose same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent [or parents] would be in the child's best interest. Thus, a finding as to whether the termination of parental rights is in the best interest of the child represents, in essence, a finding as to whether the specifics of the parental default that have *otherwise* been found to exist are of such magnitude as to warrant the conclusion that the child himself would be better served by the grant of the petition to terminate. [Cits.]" *In the Interest of G. K. J.*, 187 Ga. App. 443, 444 (2) (370 SE2d 490) (1988).

Parental misconduct or inability is determined by finding that: "(i) The child is a deprived child, as such term is defined in Code Section 15-11-2; (ii) The lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; (iii) Such cause of deprivation is likely to continue or will not likely be remedied; and (iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child."

In this case, the evidence clearly supports the threshold factor of the determination that J. R. is a deprived child within the meaning of OCGA § 15-11-2 (8) (A) and (C). Moreover, at the time of the termination hearing, there was in place an unappealed temporary custody order finding J. R. to be deprived. The juvenile court could take no-

tice of the then controlling deprivation order. See generally *Petkas v. Grizzard*, 252 Ga. 104 (312 SE2d 107) (1984); see also *In the Interest of J. L. Y.*, 184 Ga. App. 254 (1) (361 SE2d 246) (1987) which discusses the binding effect in a termination proceeding of a prior unappealed determination of parental abandonment.

The second criterion of parental misconduct or inability was also clearly satisfied as to both parents. "In determining whether the child is without proper parental care and control, the court shall consider, without being limited to, . . . (i) A medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child; . . . (v) Physical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent. . . ." OCGA § 15-11-81 (b) (4) (B) (i) and (v). In addition, when the parent or parents are non-custodial, in determining a lack of proper parental care and control, the court is to consider, without being limited to "whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To communicate or to make a bona fide attempt to communicate with the child; [and] (ii) To provide for the care and support of the child as required by law or judicial decree. . . ." OCGA § 15-11-81 (b) (4) (C) (i) and (ii).

J. R.'s mother had before and at the time of termination of rights a medically verifiable deficiency in her mental or emotional health of a duration and nature to render her inadequate to parent J. R. Moreover, the evidence shows physical, mental and emotional neglect of J. R. on the part of both parents by virtue of their disinterest in maintaining contact with the child through visitation or other means of communication. There were at least two periods in excess of a year when neither parent made an effort to visit or communicate with the child. In addition, the father testified that he refused to provide any of the ordered child support for J. R. because of his resentment of the involvement of DFCS.

The evidence also showed that the deprivation was likely to continue and was of such a nature as to cause injury to the child, thus satisfying the third and fourth statutory criteria. At best the mother's mental health prognosis was guarded. Moreover, it was medically undisputed that the mother was not capable of adequately parenting J. R. without some mental health intervention. Even if the mother's emotional problems in relationship to her parenting ability could be helped by psychological or psychiatric counseling and/or other treatment, it was undisputed that neither parent was willing to secure such help, even at the expense of termination of their rights to their

child. Compare *In the Interest of K. E. B.*, 190 Ga. App. 121 (378 SE2d 171) (1989), which case lacked clear and convincing evidence that the parental unfitness which caused the child deprivation would not likely be remedied. Both of J. R.'s parents exhibited a complete and continuing indifference to taking the prescribed measures to correct the parenting deficiencies and to provide a situation conducive to parenting in which lawful custody of J. R. could be regained.

The clear and convincing evidence of parental misconduct and inability authorized the juvenile court to find that it was in J. R.'s best interest to terminate the parents' rights. *In the Interest of G. K. J.*, supra.

Further, the evidence showed that the child had formed substantial bonds with the maternal aunt and her family and that J. R.'s adoption by the maternal aunt and her husband was a distinct possibility if not probability. While the issues of adoptability and the prevention of "foster care drift" are not, in and of themselves, bases for determination of parental unfitness, they are to be considered, inter alia, in the "matter of the child's best interest in its 'need for a stable and secure home' under § 15-11-81 (a). . . ." *In re G. M. N. & D. M. N.*, 183 Ga. App. 458, 461 (1) (359 SE2d 217) (1987).

"A termination hearing seeks as a major concern the welfare of the child, with due regard for the rights of the parents. [Cits.] In determining the balance of the interests of the children against parental rights, the juvenile court is vested with broad discretion which will not be controlled on appeal in the absence of manifest abuse, where the ruling is supported by clear and convincing evidence. [Cits.]" *In the Interest of W. J. J.*, 176 Ga. App. 824, 826 (338 SE2d 54) (1985).

*Judgment affirmed. Carley, P. J., and Judge Arnold Shulman concur.*

DECIDED JANUARY 6, 1992.

*Kenneth E. Futch, Jr.*, for appellant.
*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Margot M. Cairnes, Staff Attorney, Michael D. Devane, Special Assistant Attorney General*, for appellee.