A93A0872. IN THE INTEREST OF G. L. H. et al., children.
(433 SE2d 357)

BIRDSONG, Presiding Judge.

The biological parents appeal the judgment terminating their parental rights to G. L. H., J. L. H., and J. D. H. They contend the evidence is insufficient to establish by clear and convincing evidence that their parental rights should be terminated as ordered.

In January 1989, appellant mother called the sheriff's department and reported that her children were being held hostage by appellant father who was threatening to kill them and had physically

---

[2] Along with detention of the bag, detention of Foster's person is also a relevant inquiry. See *Brown*, supra at 780.

abused at least one of them. The father was found in the house with J. L. H., then age twenty-one months, and J. D. H., then age eight months. The father appeared "extremely disturbed," and admitted that financial and employment pressures had caused him to physically abuse J. D. H. by repeatedly thumping the child's forehead; the child's forehead was bruised and the skin broken. Appellant mother informed a DFCS representative that the father "suffered some kind of mental breakdown" and had struck J. D. H. with his fist and had tried to suffocate him. Appellant father further admitted to the DFCS director that he had "snapped" and "just couldn't deal with it anymore." A girl child, G. L. H., who was with the mother, appeared very dirty, smelled of urine, was wearing no shoes, had matted hair, and scars and bruises on her body. J. L. H. and J. D. H. also were dressed inadequately for cold weather, were without shoes and coats, were dirty, and had dirty diapers. DFCS obtained an emergency temporary custody order the same day. Appellants entered a 30-day reunification case plan with DFCS. Subsequently, a doctor examined the children and found them fearful, withdrawn and nervous, consistent with having been subjected to physical abuse; however, J. L. H. exhibited no external signs of physical abuse.

In April 1989, G. L. H. who was born September 18, 1985, made complaints of abuse against her step-grandfather and appellant father. Physical examination revealed the child had a healed vaginal laceration probably caused by the insertion of a finger or small object. G. L. H. told the board-certified pediatrician that her father had touched her vaginal area and had hurt her. The board-certified pediatrician opined that J. D. H. had been physically abused, and that G. L. H. had been sexually abused. The record also reflects the child's so-called step-grandfather also may have sexually abused G. L. H. and made her bleed.

In October 1989, a ten-day adjudicatory hearing was held wherein the parents consented to DFCS' continuing custody of the children for eighteen months; also pursuant to the consent order, the children were found to be deprived, the father (and any other necessary family member) was to attend mental health counseling, and the parents were ordered to pay weekly child support. In August 1990, DFCS petitioned to terminate appellants' parental rights.

In May 1991, a hearing on DFCS' petition was held. The court gave the parents six months in which to comply with a new case plan; DFCS retained custody of the children. The foster parents and the board-certified pediatrician testified. G. L. H.'s foster mother testified, inter alia, that the girl had stated her so-called step-grandfather had hurt her real bad and made blood flow from her, and that her father also had touched her. The foster mother testified that G. L. H.'s mother, Jackie, had admitted she knew of this event as Jackie's

mother had "verified . . . that [G. L. H.] was raped at two years old by her step-father [Papa Joe]. . . . She had blood all over her and they put her under the shower." The foster mother also testified it was almost a year before J. L. H. "spoke anything." The children's father testified and admitted the forehead thumping incident; he claimed he could not attend mental health and parenting classes as required due to a lack of transportation and that he does not believe he needed to keep attending as he had corrected his own problems. He also denied sexually abusing his daughter; both parents claimed that they had not learned of the step-grandfather's alleged conduct until they were at the courthouse for an earlier court appearance. Although sufficient evidence was found to terminate parental rights, final determination was delayed pending the outcome of a six-month review. During the proceedings, the associate juvenile court judge made it "absolutely clear" to the parents that if the resulting court order was not complied with they would lose custody of their children.

In July 1991, the juvenile court (associate juvenile court judge) entered an order finding by clear and convincing evidence that the children were deprived. The court also found the father had touched G. L. H.'s vagina but elected not to determine whether the incident constituted sexual abuse. Also, findings were entered that appellant father engaged in parental misconduct and physical abuse of J. D. H. by repeatedly thumping the child's forehead with his finger, leaving fingernail and cut marks and bruises, and that there was an inability of both parents to provide for their children. The order further found that the parents, as of that date, had paid no weekly child support whatsoever since ordered to do so in October 1989. The court then extended DFCS temporary custody of the children for six months, ordered the parents to attend parenting classes regularly, ordered both parents to attend mental health counseling on a regular basis, increased weekly child support to $10 per child, and withheld determination of the parental rights issue for six months.

A six-month review hearing was held December 1991, and the juvenile court signed a written order in July 1992, nunc pro tunc for December 9, 1991, again finding the children deprived; it also was found that the parents had substantially failed to comply with the order issued in July 1991, by having made only one weekly child support payment in six months, having attended only four of six parenting classes, and having attended only three mental health counseling sessions while missing seven appointments. The court terminated appellants' parental rights. Appellants appealed this order to the juvenile court judge requesting a de novo hearing.

On June 4, 1992, the juvenile court judge issued a detailed order terminating appellants' parental rights; at the time of this order, the

children had been in foster care for three years and four months and had only seen their parents once a month for the past year. The record reveals J. D. H. already has started to view his foster parents as his real parents and his real parents as strangers. In this order, the juvenile court judge documented the parents' failure to comply substantially with the order for court-mandated mental health counseling, court-mandated parenting classes, court-mandated child support payments, the children's needs for "a stable, permanent home environment," and certain other indicia, including the parents' lack of a high school education, relatively unstable employment records, and the physical limitations of their current residence. However, the order also acknowledges that in 1991 the couple had another child, and that DFCS' subsequent inquiry revealed that "everything appears to be fine." *Held*:

1. Ample evidence exists in the trial record to sustain the findings of fact of the juvenile court. In the disposition of appeals in parental termination cases, the reviewing court is to defer to the lower court in the area of factfinding and should affirm unless the appellate standard of review is not met. The appropriate appellate review standard is whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parents' rights to custody were lost. *In the Interest of E. P. N.*, 193 Ga. App. 742, 748 (2c) (388 SE2d 903).

2. Parental unfitness supporting termination of parental rights can be caused either by intentional or unintentional misconduct resulting in abuse or neglect of the child or by what is tantamount to physical or mental incapacity to care for the child. *In the Interest of A. L. T.*, 198 Ga. App. 477 (402 SE2d 97). Determining the propriety of termination of parental rights is a two-step process pursuant to OCGA § 15-11-81 (a). First, the court shall determine if there exists clear and convincing evidence of parental misconduct or inability; secondly, if such evidence exists, the court then considers whether termination of parental rights is in the best interest of the child, " 'after considering the physical, *mental, emotional*, and *moral* condition and needs of the child,' " including the need for a stable home. *In the Interest of S. H.*, 204 Ga. App. 135, 138 (1) (418 SE2d 454). With certain exceptions not here applicable, a judicial determination of parental misconduct or inability can be made subject to the following four findings: First, the child is deprived within the meaning of OCGA § 15-11-2. This finding was made previously and not timely appealed in this case; accordingly, the courts can take notice of the then controlling deprivation order. *In the Interest of J. R.*, 202 Ga. App. 418, 422-423 (414 SE2d 540). Further, there exists in this case ample evidence to support the threshold finding that the children

were deprived children within the meaning of OCGA § 15-11-2 (8) (A). Secondly, the lack of proper parental care is the cause of the child's status as deprived. Third, such cause of deprivation is likely to continue or will not likely be remedied. In this regard, while past deprivation is not sufficient for termination without a showing of present deprivation, the past conduct of the parent is properly considered by the court to determine whether such conditions of deprivation are likely to continue. *In the Interest of S. K. L.*, 199 Ga. App. 731, 733 (1) (405 SE2d 903). Likewise, a parent's failure to comply with the requirements of court-mandated mental health counseling or parenting education courses is a factor which may be considered to determine the likelihood of whether the deprivation is likely to continue or will not likely be remedied. Fourth, the continued deprivation will cause or is likely to cause serious physical, mental, emotional, *or* moral harm to the child. *In the Interest of S. H.*, supra.

In addressing the "child's best interest" prong of the test, " ' "those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent[s] would be in the child's best interest." ' " Id. at 140. "It would be nothing short of draconian for this court to usurp the trial court's lawful functions by re-weighing evidence and re-deciding witness credibility, when as a result we are subjecting these children to the likelihood of continuing emotional and moral harm. Our state constitution provides protection to persons and property is the paramount duty of government. Ga. Const. of 1983, Art. I, Sec. I, Par. II. This constitutional right of protection extends equally to children as well as adults. In the United States, the parens patriae function belongs with the states. We should not pay mere lip service to this grave obligation by preserving in legal fiction an already harmful and deteriorated parent-child relationship." (Citations, punctuation and emphasis omitted.) Id.; *In the Interest of E. P. N.*, supra at 749 (2c). The lower court did not err.

*Judgment affirmed. Pope, C. J., and Andrews, J., concur.*

DECIDED JUNE 23, 1993.

*Donald W. Singleton*, for appellants.
*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Teresa E. Lazzaroni, Assistant Attorney General, J. Richard Neville*, for appellee.