521 S.E.2d 604 (1999)
239 Ga. App. 565
In the Interest of A.S.H. et al., children.
No. A99A1054.
Court of Appeals of Georgia.
August 10, 1999.
*605 Sean A. Black, Toccoa, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Joanna Temple, Demorest, for appellee.
ELDRIDGE, Judge.
The appellant in this case is a thirty-year-old woman whose parental rights to her two children, ages eight and ten, were terminated in Stephens County Juvenile Court in November 1998. We affirm the trial court's ruling.
The facts of this case, viewed in the light most favorable to the State,[1] are as follows: The appellant is the mother of eight-year-old A.S.H., a girl, and ten-year-old L.L.H., a boy. In 1991, the appellant voluntarily placed her children in the custody of the Department of Family & Children Services ("DFACS"), following a history of seizures, mental and emotional problems, homelessness, and thoughts of suicide. DFACS provided substantial, intensive assistance to the appellant in an attempt to keep the family together. However, in 1993, the children were placed in court-ordered foster care following a suicide attempt by the appellant. The children have remained in the custody of DFACS until the present, pursuant to numerous continuation orders by the juvenile court. The appellant did not appeal any of the custody extensions or the underlying findings that the children were deprived.
The appellant has since married and currently resides with her husband in an apartment, where they share homemaking responsibilities, although the husband usually does the cooking out of concern that the appellant might have a seizure and burn herself. The appellant has worked at one job during the six months prior to the termination proceeding, but she left the job after a few hours because she did not like it. Her previous job lasted only a few weeks.
On April 1, 1998, the State filed a petition to terminate the appellant's parental rights.[2] The petition noted that, during a DFACS home evaluation, the appellant was unable to understand simple questions and "has not demonstrated any skills to take care of the children," despite her participation in parenting classes.
According to a psychological examination performed prior to the termination proceedings, the appellant suffers from mild mental retardation, with a full scale I.Q. of 70 and a first grade reading and math ability. She exhibited significant problems with memory and social reasoning ability, was highly dependent *606 on others, and exhibited a passive-aggressive personality disorder.
In addition to her mental deficiencies, the appellant has been diagnosed with a major depressive disorder with psychotic features, a schizo affective disorder, a seizure disorder, and asthma. She contemplated suicide in 1991. She presently takes several types of medication to control these disorders, but has resisted mental health care.
The psychologist found that the appellant's low scores from the parenting abilities assessment suggest that she "will not be able to sufficiently provide for children in the area of parenting without intervention and assistance from a third party." He also noted that, due to her passive-aggressive personality, she quickly becomes "defiant and difficult when things are not going her way," so that her reactions to normal parenting situations are "unpredictable." Based on his observations of the appellant, he determined that the appellant "overestimates her own ability to function [and] believes she can function totally independently," even though he found that "[h]er potential for parenting is very low and there appears to be serious questions regarding her ability to independently be responsible for parenting children."
Further, he expressed concerns that she may become physically aggressive with the children, or may use guilt, negative comments, or manipulation to control the children. Such concerns were realized in part when, during supervised visits with the children, the appellant jokingly called the boy a "dummy"; complained that the children did not bring anything for her; and told the boy that she depended on him to take care of her.
The psychologist also evaluated the appellant's husband, who presented a full scale I.Q. score of 73 (mild mental retardation) and exhibited a second to third grade ability in reading and math. However, unlike the appellant, her husband completed high school and held a driver's license. He was not employed and had no demonstrable employment history. The psychologist also noted various specific concerns about the husband's ability to manage additional parental responsibilities if the children were returned to their mother.
After examining L.L.H., the ten-year-old boy, the psychologist found that the boy exhibited an extremely high full scale I.Q. of 121. He also noted that the child had expressed feelings of being concerned about his mother's well-being. In the psychologist's opinion, if the child was reinstated in his mother's home, the roles of mother and child may be reversed, so that the child would become the caregiver and the mother would become increasingly dependent. As a result, the child "would increasingly be looked to as an individual who could make decisions and be available to provide appropriate information to others. This would make it difficult for [the child] to experience normal childhood development due to the risk of precocious adult responsibilities being placed on him. Even if they were not imposed by the adults around him, [the child] would likely feel he needed to assume the role in order to have things run smoothly." Further, the child exhibited negative behavior in the recent past, including aggression, destruction of property, lying, and stealing; such behavior increased following visits with his mother.
In contrast to her half-brother, the eight-year-old girl, A.S.H., exhibited a borderline to low average range of intelligence, with a full scale I.Q. of 76. She was in need of speech and language intervention and showed "significant academic impairment." She also showed signs of attention deficit hyperactivity disorder.
Both children expressed confusion "by the fact that other children in the foster home are being adopted and these children are not free for adoption." Therefore, DFACS noted that it "can offer them no sense of stability or security at this time."
Additional testimony was elicited from numerous DFACS caseworkers who had assisted the family over the years. The caseworkers consistently reported their observations and concerns that the appellant lacked the maturity and parenting skills necessary to care for the children. One caseworker testified about the difficulty she had in communicating with the appellant, due to appellant's apparent inability to understand even simple questions. The caseworkers testified that *607 the appellant had long-standing problems obtaining housing and ensuring that utility and rent bills were paid on time. The caseworkers also noted that the appellant had failed to make any significant progress in meeting case plan goals, including court-ordered mental health counseling, in part because her attendance at the mandatory counseling sessions was "sporadic." The appellant's most recent caseworker expressed concerns that the appellant was not taking her medication as directed, based on incidents in which the appellant suddenly became extremely agitated, aggressive, and violent; began hallucinating; or required restraints from hurting herself or others. According to this caseworker, this indicated the possibility that the appellant may become violent with the children. The caseworkers unanimously opined that termination of the appellant's parental rights was appropriate in this case and in the best interests of the children.
After hearing testimony during the termination proceeding and considering all of the evidence, the trial court found that, due to her limited mental capacity and parenting abilities, the appellant was "barely" able to take care of herself, so that the children would not have a secure, stable home with her. He found that such parental inability caused the children to be deprived, and that they were harmed thereby "by virtue of their languishing in temporary foster care" for over five years. As such, termination was in the children's best interests. Accordingly, he terminated the appellant's parental rights, and she appeals. Held:
1. In her first enumeration, the appellant contends that the trial court erred in finding that there was clear and convincing evidence of parental inability under OCGA § 15-11-81(b)(4).[3] We disagree.
The standard of appellate review where a parent's rights to [her] child have been severed is whether[,] after reviewing the evidence in the light most favorable to the appellee [(DFACS)], any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. The factfinding and weighing of evidence is to be done in the trial court under the clear and convincing evidence test. The reviewing court is to defer to the lower court in the area of factfinding and should affirm unless the appellate standard of review is not met.
(Citations and punctuation omitted.) In the Interest of A.Q.W., 217 Ga.App. 13, 14, 456 S.E.2d 284 (1995). See also In the Interest of C.G., supra; In the Interest of K.A.C., 229 Ga.App. 254, 493 S.E.2d 645 (1997); In the Interest of T.B.R., 224 Ga.App. 470, 472, 480 S.E.2d 901 (1997); In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997); In the Interest of J.H., 210 Ga.App. 255, 258(1), 435 S.E.2d 753 (1993).
The statutory criteria for the termination of parental rights is the two-step procedure of OCGA § 15-11-81(a). First[,] the court determines whether there is clear and convincing evidence of parental misconduct or inability. Second[,] the court considers whether termination is in the best interest of the child. [As to the first step, parental misconduct or inability] is determined by finding: 1) the child is deprived; 2) lack of proper parental care or control is the cause of the deprivation; 3) such deprivation is likely to continue or will not be remedied; 4) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. OCGA § 15-11-81(b)(4)(A). Among the factors which may be considered with regard to a child lacking proper parental care or control [is a] medically verifiable deficiency of the parent's mental or emotional health of such duration or nature as to render the parent unable to provide adequately for the child's [physical, mental, emotional, or moral] needs.
(Citations and punctuation omitted.) In the Interest of A.M.V., 222 Ga.App. 528, 529, 474 S.E.2d 723 (1996). See also OCGA § 15-11-81(b)(4)(B)(i); In the Interest of C.W.S., 231 Ga.App. 444, 445(2), 498 S.E.2d 813 (1998); In the Interest of K.A.C., supra.
*608 In this case, the trial court heard extensive evidence that the appellant suffers from mental retardation and mental illness, as well as seizures. The psychologist testified that, due to mental retardation, the appellant's ability to care for her children without significant assistance from others was "seriously questioned." Although the appellant receives some assistance from DFACS and her husband, such assistance cannot justify returning the children to a parent with such limited mental abilities and such complex physical and mental health problems.
This case is similar to In re S.R.J., 176 Ga.App. 685, 686, 337 S.E.2d 444 (1985),[4] wherein this Court specifically considered the following issue:
whether a juvenile court can terminate a parent's right to rear and control a natural born child where the parent is mentally incapable of rearing a child but who, with ever present and capable help, can keep custody and control of a child even though ultimate responsibility is placed upon someone other than the parent.
In answering in the affirmative, this Court noted that
[i]n the case of In the Interest of T.R.G., 162 Ga.App. 177, 179, 290 S.E.2d 523 [(1982)], we held: "The majority of cases in this state dealing with factual situations of this type have enunciated a rule that in termination cases the welfare of a child is of paramount importance provided there is also evidence that (as pertinent to this case) the parent suffers from some mental disability that renders the parent unable to care for the child (i.e., unfit). This case clearly fits that mold. There is no dispute that as of the time of the hearing and for the foreseeable future, the appellant mother is unable to furnish proper parental care and control necessary for the child's physical, mental and emotional health and that these conditions and causes of deprivation are likely to continue for the foreseeable future." Of similar import is the case of Chancey v. Dept. of Human Resources, 156 Ga.App. 338, 340, 274 S.E.2d 728 [(1980)]. In the instant case, the inquiry at the deprivation hearing was not whether the parent, for her misconduct, deserved to have her parental rights terminated. The question was whether the child was without proper parental care or control, subsistence, education as required by law. The evidence is uncontested that the mother, standing alone, cannot fulfill those responsibilities.
In re S.R.J., supra at 686, 337 S.E.2d 444. See also In the Interest of C.D.C., 230 Ga. App. 237, 238, 495 S.E.2d 872 (1998); In the Interest of C.D.F., 222 Ga.App. 905, 476 S.E.2d 654 (1996). This is particularly true in a case such as this, wherein the mother experiences chronic physical and mental health problems which further reduce her already limited ability to cope with parenting responsibilities.
Further, even though the appellant is now married,
[t]his case is not dependent upon the parenting skills of the [appellant's spouse,] who has no parental rights in the child, but upon the parental rights of the natural mother. The test must be whether the parent, ultimately standing alone, is capable of mastering and can effectively demonstrate the ability to utilize those parenting skills. That is the sole issue for determination. The facts disclose [that] she alone cannot.
In re S.R.J., supra at 686, 337 S.E.2d 444.
The evidence presented also clearly demonstrated that the appellant's mental and physical status was likely to remain unchanged. As such, this case is distinguishable from In the Interest of C.G., supra,[5] because evidence was presented that the appellant's mental disability and personality *609 disorders "would remain constant over time, even if [the appellant] were to be involved in counseling, parenting training, or mental health treatment involving medication[.]"
Finally, the evidence demonstrated that the children have been harmed by the instability in their lives as a result of remaining in foster care for over five years. The trial court found that "the children are being harmed by virtue of their languishing in temporary foster care." Such "foster care drift... prevents children from forming emotional attachments with others." In the Interest of T.B.R., supra at 476(1)(d), 480 S.E.2d 901. See also In the Interest of M.E.C., 228 Ga. App. 9, 14(1)(d), 491 S.E.2d 107 (1997); In the Interest of E.P.N., 193 Ga.App. 742, 747(2)(c), 388 S.E.2d 903 (1989).
In addition to foster care drift, the evidence showed that the children were also at risk due to the appellant's potential for seizures while caring for the children. Although the appellant points out that the children have never been harmed while in her care, the children have not lived with the appellant in over five years and her visitations with the children have been supervised by DFACS personnel. Moreover, when the evidence demonstrates the significant possibility that the children may be physically, emotionally, or mentally harmed if returned to their parent's care, the trial court is not obligated to return the children and wait until the children actually have been harmed before terminating the parent's rights. See In the Interest of C.D.F., supra; In the Interest of E.P.N., supra at 749, 388 S.E.2d 903.
Accordingly, under the specific facts and circumstances of this case, we find that there is clear and convincing evidence to support the trial court's determination that the appellant suffers from a medically-verifiable mental inability, coupled with mental and physical illness, which renders her unable to adequately provide for the needs of the children, and that such inability is likely to continue and cause harm to the children. There was no error.
2. In her second enumeration, the appellant challenges the trial court's determination that termination of her parental rights was in the best interests of the children.
Once the trial court has determined that continued parental misconduct or inability will cause or is likely to cause harm to the children, the court must then consider whether termination of parental rights is in the child's best interest. OCGA § 15-11-81(a). In making such determination, the trial court should consider the child's physical, mental, emotional, and moral needs, including the need for a secure and stable home, as well as the detrimental effects of prolonged foster care. Id.; In the Interest of K.A.C., supra; In the Interest of M.L., 227 Ga.App. 114, 117, 488 S.E.2d 702 (1997); In the Interest of D.I.W., 215 Ga.App. 644, 646, 451 S.E.2d 804 (1994); In the Interest of J.M.C., 201 Ga.App. 173, 175, 410 S.E.2d 368 (1991). "The same factors which show parental inability may also show that termination would be in the children's best interest. In the Interest of G.K.J., 187 Ga.App. 443, 444(2), 370 S.E.2d 490 (1988)." (Punctuation omitted.) In the Interest of M.L., supra at 114(2), 488 S.E.2d 702.
After reviewing the complete record of this case, we find that the trial court's determination that termination of the appellant's parental rights is in the children's best interest is supported by clear and convincing evidence.
Judgment affirmed.
POPE, P.J., and SMITH, J., concur.
NOTES
[1] In the Interest of C.G., 235 Ga.App. 23, 508 S.E.2d 246 (1998).
[2] The children have different fathers, and the State petitioned to terminate their parental rights, also. However, neither father participated in this appeal.
[3] The appellant did not dispute on appeal the trial court's finding that the children were deprived.
[4] In that case, the facts showed that the mother was mentally retarded and "demonstrated an inability to comprehend or retain more than the simplest of parenting skills in spite of prolonged training. There [was] evidence that the mother has never harmed the child[.]" In re S.R.J., supra at 685, 337 S.E.2d 444.
[5] In that case, this Court determined that the State had not established that the parent's mental disability was likely to continue to the detriment of the child. Accordingly, the termination was reversed, but the State was allowed the opportunity to make the requisite showing upon remand.