59869. RAY v. DEPARTMENT OF HUMAN RESOURCES.

BIRDSONG, Judge.

Parental termination. Wilma N(ix) Ray and the Department of Human Resources (DHR) have had a protracted and litigious relationship over the past five years. When Mrs. Ray was sixteen years of age, she gave birth to a girl child (R. C. N.). At that time she was unmarried and living in precarious financial circumstances. At the request of DHR, Mrs. Ray (Nix) consented to relinquish custody of the infant, and the child was placed in foster home care. When the infant was four months old (in July, 1975), DHR sought a juvenile court ruling that the child was deprived, and sought to have Mrs. Ray's parental rights terminated. The Juvenile Court of Hall County held that requisite hearing and terminated those rights. This court considered the appeal of Mrs. Ray and reversed the termination decision on the grounds that DHR had not established that the child was a deprived child or that such alleged deprivation was likely to continue. *R. C. N. v. State,* 141 Ga. App. 490 (233 SE2d 866). This decision was rendered in March, 1977. During the interim between the judicial termination of parental rights in July, 1975, and the setting aside of that judgment in March, 1977, the mother, Mrs. Ray, had little or no contact with the child. Between March, 1977 and July, 1979, investigators (case workers) of the protective services of the DHR sought to reestablish contact with the mother (who had married a man named Ray) for the purpose of attempting restoration

of rapport between the mother and the child. These efforts proved difficult because Mrs. Ray was not in constant contact with the local office of the DHR. During these two years, the child remained in custody of DHR and apparently was in one particular foster home. A series of home visits were made by DHR investigators with Mrs. Ray with a view toward returning the child to her mother's custody and control. Also a number of home visits were arranged between the child and her mother. During this time, the mother, Mrs. Ray, gave birth to two children by her husband, Ray. However, the marriage was punctuated by marital discord and some degree of violence manifested by the husband, including physical violence to the wife and a shooting incident at the home involving some unidentified male. There was evidence that throughout this entire period, Mrs. Ray did not contribute financial support to the little girl or the foster family, did not give the child any clothes or presents on her birthday or at Christmas, and apparently showed little interest in the welfare of the child. It was shown through testimony of the case workers that on most of their contacts with Mrs. Ray, she rarely, if ever, asked about or discussed her daughter but talked about financial assistance, her marital problems, or the welfare of her other two children. In her defense, Mrs. Ray gave evidence that she did not bother the child at the foster home because, in effect, she felt that would get her in trouble with the DHR or the juvenile court; she did not give presents to her child because when she had first attempted to do so, the foster parents had rejected the idea and discouraged her from doing so, indicating that the child would not be allowed to receive them; and that she had not contributed to the support of the child because she had not been asked to do so and did not know she could. On two occasions between 1977 and 1979, Mrs. Ray voluntarily signed papers relinquishing all her parental rights to DHR. On each occasion, within the 10-day period provided by law, Mrs. Ray withdrew the waiver, thus indicating her desire to regain custody of her daughter. Mrs. Ray offered testimony that she always felt pressure from the case workers to release her parental control and did so on one occasion because of financial stress and on the other, because of her marital problems. Futhermore, DHR offered evidence that Mrs. Ray had moved more than ten times within a very short period and had not developed a very satisfactory employment record. Mrs. Ray countered with evidence that she was either divorced or getting a divorce and that her marital problem had been the primary cause of her frequent moves (an attempt to get away from the harassment from her husband) and that her employment problems were basically from the same cause. The evidence showed that Mrs. Ray was satisfactorily caring for her two younger children, sired by

Ray, and that DHR had never shown any desire to remove either of these children from the care and custody of Mrs. Ray. Also, DHR offered evidence that to move the child (R. C. N.) from a well-established foster home and from the custody of people the child considered her parents, would be a significant trauma to the child's psyche. However, no evidence was presented to show that Mrs. Ray was "unfit" or that she did not love the child, would not make a bona fide attempt to support the child emotionally and financially, or that she was an abuser of drugs, alcohol or had a criminal record. In fact, DHR successfully convinced the juvenile court only that Mrs. Ray had made little or no contribution to the support of and had shown little interest in the welfare of her daughter (which the trial court characterized as "virtual abandonment") and that Mrs. Ray could not offer a stable or comfortable or as safe a home as could be furnished through DHR and that Mrs. Ray had a poor employment record. Most of the other evidence reflected Mrs. Ray's actions and experiences when she was a teenager under severe marital stress.

When renewal of the allowable two-year custody period became imminent in July, 1977, DHR petitioned not only for continued custody of the child but once again sought to have the mother's parental rights terminated.

At the termination proceedings, counsel for Mrs. Ray sought to take the deposition of the three DHR case workers who had investigated the case between July, 1977 and July, 1979, and to subpoena the records of DHR pertaining to Mrs. Ray's case. Ray sought information which showed the number of visits by case workers to her home, visits by her to DHR, telephone calls made, and other similar information which would have a tendency to disprove allegations by DHR that Mrs. Ray had abandoned her child or failed to show interest in the welfare of her child. The juvenile court initially issued an order directing the depositions. However, on the day the depositions were to be taken, the court issued a protective order on behalf of DHR relieving the case workers from responding to the depositions and protecting DHR records completely from perusal. The court did ultimately make an in-camera examination of the DHR records pertaining to the case and orally released certain information to Mrs. Ray. Upon completion of the termination hearing, the trial court once again terminated all Mrs. Ray's parental rights in R. C. N. Mrs. Ray brings this appeal enumerating numerous errors, but these may be reduced to allegations that the trial court erred in refusing Mrs. Ray discovery by way of depositions or access to the DHR records within the limited scope requested, and in finding that R. C. N. was a deprived child or that deprivation was likely to continue so as to justify termination of Mrs. Ray's parental rights. *Held:*

1. We will first address the refusal of the juvenile court to allow counsel for Mrs. Ray to take the depositions of the three case workers who had worked with Mrs. Ray during the period from July, 1977 to July, 1979, and the denial of access to records of DHR concerning the case even to the limited extent requested by Mrs. Ray.

We first note that this court has already held that neither the Fourteenth Amendment nor the corresponding provision of our state constitution (Code Ann. § 2-103) mandates pretrial discovery in proceedings to terminate parental rights. *In the Interest of L. L. W.,* 141 Ga. App. 32, 33 (232 SE2d 378). Further, this court has held that the Civil Practice Act is not per se made applicable to juvenile courts. *Crook v. Dept. of Human Resources,* 137 Ga. App. 817, 818 (224 SE2d 806). However, we also are aware that the courts of this state have firmly supported the concept of due process in all judicial proceedings and that the provisions of the Civil Practice Act may be adopted by a juvenile court as to procedures for which provision is not specifically made in the juvenile code. *English v. Milby,* 233 Ga. 7 (209 SE2d 603); *In the Interest of L. L. W.,* supra, p. 33. It is generally agreed by the parties hereto that the juvenile code is silent, neither prohibiting nor permitting discovery as such. However, because termination of parental rights is more civil in nature than criminal, we believe it generally to be the legislative intent to grant discovery of evidence relevant to an issue in controversy, except where otherwise barred. See the dissent of the present Chief Judge Deen in *G. M. J. v. State of Ga.,* 130 Ga. App. 420, 424 (203 SE2d 608); CPA 37.

Furthermore, Ga. L. 1975, pp. 1135, 1136 (Code Ann. § 99-4301) provides in pertinent part: "Each and every record concerning reports of child . . . neglect which is in the custody of the Department of Human Resources . . . is hereby declared to be confidential and access thereto is hereby prohibited except as provided in section 99-4302." Code Ann. § 99-4302, as pertinent, provides: "(a) Notwithstanding the provisions of section 99-4301, the following . . . agencies shall have reasonable access to such records concerning reports of child . . . neglect: . . . (2) A court, by subpoena, upon its finding that access to such records may be necessary for determination of an issue before such court: Provided, however, that the court will examine such record in camera, unless the court determines that public disclosure of the information contained therein is necessary for the resolution of an issue then before it; and the record is otherwise admissible under the rules of evidence . . . "

As we read the provisions of the above two quoted statutes, it is beyond peradventure that where a juvenile court considers it necessary for the resolution of an issue before it, the court may order

the disclosure of the information. We do not perceive a different conclusion in the case of *In the Interest of L. L. W.,* supra. In that case, this court denied a juvenile court the authority, under any acceptable rule of discovery, to grant counsel for a father facing termination of parental rights, the unbridled opportunity to interview individually and completely alone each of the four children involved in the termination proceedings. This court held that such a procedure was incompatible with the welfare of the children involved and what justice might be promoted thereby was outweighed by the perils inherent in such interviews. 141 Ga. App. 34.

On the contrary, when we compare the desire of the courts of this state to promote due process in all judicial proceedings, the fact that the provisions of the Civil Practice Act may be made applicable to the juvenile code by adoption where contrary procedures are not specifically provided for in the juvenile code; that discovery is mandated in civil proceedings by Code Ann. § 81A-137 as a facet of due process standards applicable in our courts; and that juvenile courts may, in the exercise of their discretion, release relevant information dealing with records concerning child neglect, we have no hesitancy in holding that as a matter of public policy as well as due process, discovery, within confines set by the trial court, is fully applicable in juvenile court proceedings.

The juvenile court in this case apparently concluded that there was no right of discovery in juvenile court proceedings, and it was on that basis that it denied both the taking of depositions and approved a protective order denying counsel for Mrs. Ray any access at all into the records of the DHR. As indicated above, we believe that discovery is mandated in appropriate circumstances as limited by the confidentiality imposed by Code Ann. Ch. 99-43. Even though the court ameliorated its error by orally furnishing some information to counsel for Mrs. Ray, we conclude that where, as here, the ruling of the trial court, which ordinarily is one within the sound discretion of the court, shows that no discretion was in fact exercised, and the judgment rendered is based upon an erroneous view of the law which would preclude the exercise of a discretion, reversal results. *Unnever v. Stephens,* 142 Ga. App. 787, 789 (236 SE2d 886).

2. In her second major contention, Mrs. Ray argues that the evidence does not show that her child is a deprived child or that any such deprivation is likely to continue, and that the trial court erred in concluding to the contrary.

The evidence before the juvenile court showed that Mrs. Ray has never had custody of R. C. N. but had sought that custody for the entire time of the child's life. There was no evidence that the child was abused by anyone. In fact the evidence showed that the child was

bright and alert and in good health. Mrs. Ray apparently loved all three of her children. The evidence showed that Mrs. Ray adequately cared for her two younger children and that there was no indication of mistreatment of either of these children. No evidence was submitted of bad character or habits on the part of Mrs. Ray. There was evidence that Mrs. Ray was seeking to further her education and was employable.

In this case the trial court made findings of fact that Mrs. Ray had shown evidence of instability of domicile; a poor work record; had shown little or no interest in the welfare of the child by her past conduct; had furnished no financial support for the child; had not let DHR know her whereabouts for substantial periods of time; that psychologically, the child needed permanence of home situation; and that on two occasions, Mrs. Ray had voluntarily relinquished her parental rights to DHR but on each occasion had withdrawn that waiver. The court found a "virtual" abandonment of the child and that the child was indeed deprived. In short, the court found that the child's home life would be better in an environment other than with her mother.

In support of the judgment of the juvenile court, appellee DHR argues that the requirement that the evidence support a finding that a parent is guilty of "profoundly detrimental and egregious misconduct" should be abandoned and the true test should be the welfare of the child; and if the welfare of the child may be affected either by egregious misconduct of a parent or because of "other circumstances," not necessarily related to parental conduct, then the child should be declared sufficiently deprived so as to warrant parental termination. In support of this position, appellee has cited numerous cases more recent than *R. C. N. v. State of Ga.,* supra.

We have examined each of the cases cited to us by the appellee. It is true that each of these cases concludes that the welfare of the child is of paramount concern. But it is equally true that each case weighs the welfare of the child against the right to custody, care and nurture inherent in the natural parent. Stanley v. Illinois, 405 U. S. 645, 665 (11) (92 SC 1208, 31 LE2d 551). For instance, we find *In the Interest of A. A. G.,* 146 Ga. App. 534 (246 SE2d 739) evidence that the parent (the father) was in prison, that he contributed no support, had an extensive criminal record, was a user of heroin, and had remained unemployed while he was last out of prison. In the case of *Childers v. Clayton County Dept. of Family &c. Services,* 147 Ga. App. 825 (250 SE2d 564), the evidence showed that among other problems, the children suffered from moderate to severe developmental retardation because of their home environment, that they showed injuries consistent with child abuse, were denied medical care, and

were improperly fed, clothed or bathed. In *Wynn v. DHR,* 149 Ga. App. 559 (254 SE2d 883), the evidence established that the child had suffered physical abuse (broken bones) and bore all indication of a battered child, and the mother was psychologically incapable of caring for her children. In *Hood v. DHR,* 150 Ga. App. 219 (257 SE2d 340), the parent was required to care for a child who suffered from a serious disorder that required much more personal attention than normally was required in a home, and past experience indicated that parent could not or would not furnish the extra care and attention required. In *Kilgore v. DHR,* 151 Ga. App. 19 (258 SE2d 680), it was shown that the parent had a criminal record and had spent time in prison. The children were filthy, sore-encrusted and mentally retarded. Foster care had shown dramatic improvement. The mother was openly living in a fornicatory relationship and was diagnosed as having an anti-social personality that would probably ensure continuation of the poor home environment. In *Henderson v. DHR,* 152 Ga. App. 74 (262 SE2d 241) (1979), the facts showed that the father was in jail and had a long criminal record, having spent more than a third of the lifetimes of the children in jail; he was a drug addict (heroin and cocaine); had provided no home; and was pending further imprisonment for additional criminal misconduct so that there was no likelihood that the situation would improve. The same is true of cases decided by our Supreme Court. *In the Interest of J. C.,* 242 Ga. 737 (251 SE2d 299), it was shown that the parents' mental incapability of maintaining and caring for their children resulted in severe malnutrition and that every effort and service of DHR had not been sufficient to better equip the parents to care adequately for their children. (To the same effect is *Cox v. DHR,* 148 Ga. App. 43 (250 SE2d 839)). *In the Interest of M. A. C.,* 244 Ga. 645 (261 SE2d 590), the home environment was shown to be such that the children were found to be so unsanitary that maggots were found in their soiled diapers, the children were beaten to the point of bruises, their hair was pulled out, one had been injured by hitting his head against a water faucet, and the stepfather bizarrely passed gas into a plastic dry cleaning bag and then would put the bag over the child's head to punish him. The mother was shown to be promiscuously adulterous.

As can be seen in each of these cases, the parent or parents involved were intentionally or unintentionally guilty of egregious misconduct toward their children. In none of these cases was the court confronted with a capable parent who loved the child and was making a bona fide attempt to have and care for the child in question. Except in the case of *In the Interest of J. C.,* supra, *Cox v. DHR,* supra and *Hood v. DHR,* supra, the parents' abusiveness or total irresponsibility in the care, custody and nurture of their children

resulted in injury or danger to health, and the evidence showed little or no likelihood that the situation would improve. Even in *J. C., Cox* and *Hood,* supra, though the parents apparently could not control the situation through no fault of their own, the facts further showed that because of parental conduct, and only after experience, that conduct had shown the very life and well-being of the child was endangered, was the parental right terminated.

To adopt the position advocated by DHR in this case would sanction an agency of the government to evaluate the physical well-being of a child; and if personnel of that agency determined the economic or cultural level or a home environment was sufficiently difficult that some degree of hunger or other privation could not be avoided, the agency could seek to terminate the parental control and thereby place the child in a less difficult and more desirable environment. DHR admirably would like to set minimum standards below which deprivation is automatic without consideration of parental misconduct. Such determination could be made in many homes in this state today, in spite of the best efforts of loving parents to furnish a good and secure home for their children. We hold it is not proper to consider the question of termination of parental rights based solely upon a "welfare of the child" test, without some required showing of parental unfitness, caused either by intentional or unintentional misconduct resulting in abuse or neglect of the child, or by what is tantamount to physical or mental incapability to care for the child. See *Shover v. DHR,* 154 Ga. App. 38 (1980). We echo the sentiments of the Supreme Court in Quilloin v. Walcott, 434 U. S. 246, 255 (3, 4) (98 SC 549, 54 LE2d 511), where it held that there can be little doubt that due process would be offended if a state attempts a forcible breakup of a natural family, over the objection of the parents, without *some* showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest. Considered in this context, we do not draw the same conclusion as that of DHR, namely that the cases following *Elrod v. Hall County Dept. of Family &c. Services,* 136 Ga. App. 251 (220 SE2d 726) and *R. C. N. v. State of Ga.,* supra, lead down two different paths, i. e., that termination of parental rights can be supported by evidence of egregious parental misconduct or by evidence that the welfare of the child demands it regardless of the lack of parental causation. We, on the contrary, find the cases still consistent, in that the cases such as *R. C. N. v. State of Ga.,* supra, and *In re M. A. C.,* supra, ultimately consider parental fitness as it affects the welfare of the child.

Examining the case in the light of the fitness of Mrs. Ray as it affects the welfare of R. C. N., we find that each of the predicates of unfitness advanced by DHR at this last hearing was advanced before

this court on the last appeal. We found at that time the evidence showed Mrs. Ray's conduct had not been exemplary, but neither had it been so extraordinary that the state should intervene and take her child away from her permanently. Once again, we so conclude.

*Judgment reversed. Deen, C. J., and Sognier, J., concur.*

ARGUED MAY 5, 1980 — DECIDED JUNE 26, 1980 —

*Joan C. Stoddard, Mary R. Carden, John L. Cromartie, Jr., Roy Sobelson,* for appellant.

*Arthur K. Bolton, Attorney General, Carol Atha Cosgrove, Assistant Attorney General, William M. House,* for appellee.