## A98A2154. O'NEAL v. OXENDINE.
### (514 SE2d 908)

RUFFIN, Judge.

John O'Neal appeals from the trial court's denial of his motions to intervene and to take discovery in a rehabilitation action filed by John Oxendine, Commissioner of Insurance for the State of Georgia (the Commissioner), against Master Health Plan, Inc. (MHP), a Georgia health maintenance organization. He also contends that the trial court erred in refusing to allow him to present evidence at a

hearing in the rehabilitation action. For reasons discussed below, we affirm.

On June 11, 1997, the Commissioner filed a petition for rehabilitation against MHP pursuant to OCGA § 33-37-11, alleging, among other things, that MHP was undercapitalized, that it had suffered net operating losses in every quarter since September 30, 1994, that its controlling shareholder had been convicted of several offenses including conspiracy to defraud the United States, and that it had filed a bankruptcy petition in U. S. bankruptcy court. On June 19, 1997, the trial court entered a consent order appointing the Commissioner as rehabilitator of MHP, with the power to manage MHP's business and to take any and all actions necessary or appropriate to reform and revitalize MHP. See OCGA § 33-37-13 (c).

The business continued to suffer operating losses after the appointment of the rehabilitator, and the Commissioner was unsuccessful in his attempts to locate a purchaser for the business. On January 14, 1998, the Commissioner entered into a letter agreement with HMO Georgia, Inc. (HMOG), a Georgia health maintenance organization, providing that, upon approval by the trial court, the parties would enter into an assumption reinsurance agreement whereby HMOG would assume MHP's policy obligations with respect to its 6,400 remaining policyholders.

On January 20, 1998, the Commissioner filed a motion seeking the trial court's approval of the reinsurance agreement pursuant to OCGA § 33-37-13 (e). The trial court entered an order requiring any interested parties to appear at a hearing on February 9, 1998 to show cause why the motion should not be granted. It also ordered that no discovery would be allowed without approval of the trial court, after notice and a hearing and upon a showing of good cause.

O'Neal, a former executive director of MHP, had obtained a $476,592.30 judgment against MHP on May 12, 1997 for violations of the federal False Claims Act, 31 USC § 3730. On January 23, 1998, O'Neal filed a motion to intervene in the rehabilitation action. On January 29, O'Neal filed a motion seeking authority to take depositions of MHP and HMOG and to obtain discovery of certain financial records and other documents of MHP and HMOG. O'Neal contended that such discovery was necessary to enable him to determine whether approval of the reinsurance agreement was fair and in his best interest.

The trial court held a hearing on the motion for approval of the reinsurance agreement on February 9, 1998. At the hearing, the Commissioner's attorney informed the court that MHP continued to suffer substantial losses, approximately $200,000 to $300,000 per

month, after the appointment of the rehabilitator.[1] At the time of the hearing, the company had approximately 6,400 policyholders, or subscribers, left. The Commissioner had attempted to find a purchaser for the company, but all negotiations for a sale were unsuccessful. The Commissioner then began looking for a company to assume MHP's obligations with respect to its existing subscribers, and HMOG was the only company to make an offer to do so.

The proposed reinsurance agreement with HMOG consisted of three components. First, HMOG would assume MHP's outstanding liabilities under its insurance policies as of December 31, 1997, and MHP would transfer approximately $1.2 million in cash reserves to enable HMOG to satisfy such liabilities. Second, HMOG would co-insure on a 100 percent basis MHP's obligations under its existing policies from January 1, 1998 until March 1, 1998, in exchange for a transfer of policy premiums from MHP to HMOG. According to the Commissioner, this would benefit MHP because the premiums generated from its policies were insufficient to cover the payments required under such policies. Finally, on March 1, 1998, all of MHP's existing policies would be converted into HMOG policies, and MHP would be relieved of any further liability on such policies. The reinsurance agreement contained an escape clause, allowing HMOG to terminate the agreement if closing did not occur by March 1, 1998.

According to the Commissioner, entering into the reinsurance agreement with HMOG would "stop the bleeding of the company" and avert an immediate liquidation. Unless otherwise approved by the court, liquidation would require MHP to remain liable under its policies for at least 30 days following the liquidation order. See OCGA § 33-37-18. Thus, if the reinsurance agreement were not approved and MHP were forced to liquidate, HMOG would not assume MHP's losses for January and February 1998, and MHP would be liable for further losses at least through March. If the agreement were approved, however, MHP could avoid these continuing losses. In addition, MHP could continue for a time to operate its profitable "third party administrator" business, providing administrative services to self-insured plans, although the Commissioner believed that liquidation ultimately was likely.

O'Neal appeared at the hearing and requested that the court consider his motions to intervene and to conduct discovery. O'Neal's attorney told the court that he did not have enough information to determine whether the reinsurance agreement was in the interest of

---

[1] Although no testimonial evidence was offered at the hearing, "[a]ttorneys are officers of the court and their statements in their place, if not objected to, serve the same function as evidence." (Punctuation omitted.) *Cafagno v. Hagan*, 213 Ga. App. 631 (445 SE2d 380) (1994).

creditors, although he believed that the Commissioner had undervalued the company and questioned the Commissioner's management of the business. However, the attorney stated that

> I have to concede to you, Your Honor, it's a dangerous thing for us to come here because it could be that what the rehabilitator says is all true. . . . Our position is simply that we would like the opportunity to learn the facts under oath so that we can intelligently make a decision about this.

The trial court denied O'Neal's motion to conduct discovery, stating that it was hesitant to do something that might interfere with the consummation of the reinsurance agreement. The court also denied the motion to intervene, although it stated that

> I heard him, so I guess he was intervening. At any rate, I don't think it makes any difference. I can't see any difference whether I denied your intervention or allow you to intervene and denied your relief that you sought. So to make it clean, I will just deny your intervention.

The trial court approved the reinsurance agreement, finding that it was fair and equitable to all parties in interest and "calculated to maximize the value accorded to creditors . . . as well as offer uninterrupted coverage to [MHP's] insured members."[2]

1. O'Neal contends that the trial court erred in denying his motion to allow discovery with respect to the execution of the reinsurance agreement. This contention is without merit.

The Insurers Rehabilitation and Liquidation Act provides that "[t]he rehabilitator may take such action as he deems necessary or appropriate to reform and revitalize the insurer," and vests the rehabilitator with "all the powers of the directors, officers, and managers" of the company. OCGA § 33-37-13 (c). OCGA § 33-37-13 (e) provides that

> [i]f the rehabilitator determines that reorganization, consolidation, conversion, reinsurance, merger, or other transformation of the insurer is appropriate, he shall prepare a plan to effect such changes. Upon application of the rehabilitator for approval of the plan, and *after such notice and hearings*

---

[2] The Commissioner's motion to dismiss this appeal on the grounds of mootness is denied. Although the Commissioner contends that the reinsurance agreement was consummated after the trial court's ruling, it does not appear that O'Neal would fail to derive any benefit from a favorable ruling in this appeal. See *Grindle v. Chastain*, 229 Ga. App. 386, 388 (1) (493 SE2d 714) (1997).

*as the court may prescribe,* the court may either approve or disapprove the plan proposed, or may modify it and approve it as modified. Any plan approved under this Code section shall be, in the judgment of the court, fair and equitable to all parties concerned.

(Emphasis supplied.) The Act does not set forth any specific guidelines for giving notice of proposed action or give a creditor the right to take discovery before approval of such action, but leaves such matters to the discretion of the trial court.

In this case, the show cause order required that notice of the hearing on the approval motion be mailed to creditors on January 20, 1998, 20 days before the hearing. In his motion to intervene, O'Neal's attorney stated that O'Neal received the notice on January 20. The court specifically found that the notice required by the order "constitutes reasonable, adequate, fair and satisfactory notice of the issues to be heard by the Court at the hearing."

O'Neal did not contend below that the 20-day notice period was unreasonable in and of itself, but argued that he should be allowed to conduct discovery to determine whether the reinsurance agreement was in his best interests.[3] However, O'Neal did not file his motion for discovery until January 29, 1998, nine days after receiving notice and eleven days before the hearing. Moreover, he did not request that an expedited hearing be held on his motion, although the show cause order provided that discovery would be allowed only "after notice and a hearing and a showing of good cause." Thus, the court was not able to consider O'Neal's motion until the day of the approval hearing, at which point it was faced with the alternatives of either (1) continuing the hearing and thus delaying approval of the reinsurance agreement, or (2) denying the motion for discovery and proceeding with the hearing.

In balancing these alternatives, the trial court was faced with several considerations. First, and perhaps most important, HMOG was entitled to terminate the reinsurance agreement if it was not consummated by March 1, 1998, and any delay in approval of the agreement could have jeopardized the ability of the Commissioner to close the transaction in a timely manner. Moreover, requiring HMOG to submit to depositions and produce all documents relating to the proposed agreement, as requested by O'Neal, could have affected HMOG's willingness to consummate the transaction. In denying O'Neal's motion, the trial court indicated that it was "hesitant" to do

---

[3] For comparison purposes, we note that Rule 2002 (a) of the Federal Rules of Bankruptcy Procedure requires 20 days notice of, among other things, "a proposed use, sale, or lease of property of the estate other than in the ordinary course of business."

anything to jeopardize the transaction.

In addition, O'Neal failed to provide the trial court with any concrete basis to expect that allowing discovery was likely to lead to evidence that would affect the trial court's decision as to whether to approve the reinsurance agreement. Indeed, O'Neal's attorney admitted that the reinsurance agreement proposal might be in the best interest of the parties, and that he simply wanted to conduct discovery to be able to make an informed decision about whether to support the agreement. Combined with the fact that O'Neal did not seek an expedited hearing so that the discovery motion could be considered well in advance of the approval hearing, this clearly authorized the trial court to conclude that the possible benefits of allowing discovery were outweighed by the danger of delay, particularly in light of the Commissioner's evidence regarding the deteriorating financial condition of the company and the adverse consequences of rejecting the reinsurance agreement. Under all of these circumstances, therefore, the trial court did not abuse its discretion in denying the motion for discovery.

2. O'Neal contends that the trial court erred in approving the transfer without giving him the opportunity to present evidence in opposition to it. However, O'Neal did not attempt to present evidence at the hearing, other than through the representations of his attorney. Although O'Neal's attorney informed the court that O'Neal was present and prepared to testify that the reinsurance agreement "would not make sense," he never attempted to call O'Neal to the witness stand. Although the attorney stated that "we have depositions we're prepared to introduce into evidence" relating to the valuation of HMOs, he did not in fact attempt to introduce such depositions into evidence. The trial court never ruled that O'Neal was prohibited from introducing testimonial or documentary evidence at the hearing. Because O'Neal never attempted to introduce such evidence, but instead relied upon his attorney's representations to the court, he cannot complain on appeal that the trial court prevented him from doing so. See *Walker v. State*, 220 Ga. App. 80, 82-83 (1) (467 SE2d 388) (1996).[4]

---

[4] The dissent states that another creditor attempted to present documentary evidence, but that "[t]he court declined to accept his documentary evidence as being unnecessary to the issue it had to decide." The documentary evidence in question consisted of a contract providing that the creditor, a former officer of the company, would receive a specified amount upon the sale of the company. The colloquy between the trial court and such creditor's counsel was as follows:

Mr. Knox: Would Your Honor like for me to leave the court this contract that I mentioned on behalf of my client? The Court: I don't think it's going to help us any because I don't have any problem with believing that he is a creditor. I don't have any problem with believing what you say about his association or his connection

3. O'Neal contends the trial court erred in denying his motion to intervene. In his appellate brief, O'Neal clarifies and limits the scope of this enumeration by arguing simply that he had a right to intervene "to contest the propriety of [the reinsurance agreement]." See *Mauldin v. Weinstock*, 201 Ga. App. 514, 517 (3) (411 SE2d 370) (1991). In his motion below, O'Neal indicated that he sought intervention so that he could take discovery with respect to the reinsurance agreement. As discussed above, however, the trial court did not err in precluding O'Neal from conducting discovery prior to approving the reinsurance agreement. Although the trial court technically "denied" the motion to intervene, it allowed O'Neal to participate fully in the approval hearing and to raise objections to the reinsurance agreement. Although O'Neal elected to present no testimony in opposition to the approval motion, he was not prevented from doing so by the trial court. Accordingly, he has not shown how he has been harmed by the denial of his motion to intervene. See *Joiner v. Lane*, 235 Ga. App. 121, 125 (3) (a) (508 SE2d 203) (1998) (harm as well as error must be shown to warrant reversal).

*Judgment affirmed. McMurray, P. J., Pope, P. J., Andrews and Eldridge, JJ., concur. Blackburn, J., concurs in judgment only. Beasley, P. J., dissents.*

BEASLEY, Presiding Judge, dissenting.
1. First, I do concur in denial of the Commissioner's motion to dismiss the appeal as moot.

> The primary criterion in making this determination is whether the appellant would derive any benefit from the appeal. *Howard v. Smith*, 226 Ga. 850, 851 (178 SE2d 159) (1970); see *Essuon v. Raynor*, 231 Ga. 297, 298 (2) (201 SE2d 416) (1973) (appeal only moot as to injunctive relief, not as to damages).

(Punctuation omitted.) *Grindle v. Chastain*, 229 Ga. App. 386, 388 (1) (493 SE2d 714) (1997).
O'Neal is a substantial judgment creditor of MHP. It is patent that the possibility of recovery of his judgment is diminished by the

---

with the company. Mr. Knox: I just wanted to proffer some evidence in that regard. The Court: I have no problem with that. I don't need to look into it. It's just a question of what do I do about it. Mr. Knox: All we want is some time, Your Honor, to find out. The Court: All right. Thank you.

Contrary to the dissent's statement, the trial court did not prevent the creditor from offering any evidence; rather, it appears that the creditor simply elected not to proffer such evidence after the trial court indicated that it accepted his contention that he was a creditor of the company.

transaction which he seeks to challenge, because the transfer of MHP's main asset, its "block of business," will severely jeopardize payment in full of O'Neal's judgment. If MHP's assets have already been transferred following the entry of the appealed order, as the Commissioner states, that does not moot the issue of whether O'Neal was deprived of due process of law in the proceedings which culminated in the court's approval of the transfer by way of the coinsurance and assumption reinsurance agreement.

The trial court's judgment was entered on February 12, 1998. According to the affidavit submitted with Commissioner Oxendine's motion, the transaction closed the next day and the transfer of assets and liabilities called for in the agreement was "promptly" concluded so that effective March 1, MHP's subscribers became subscribers under HMOG's plan. O'Neal's notice of appeal was timely. Knowing that O'Neal objected to the transfer and to the procedure employed, the Commissioner acted at his peril in effectuating the judgment within the appeal period. He cannot deprive the insurer's creditor of his right to appeal by manufacturing mootness. Completing the transaction does not insulate it from the consequences of reversal of the trial court's approval of it, should that be called for by the application of law.

2. The contextual history of the matter under review demonstrates that O'Neal was shortchanged and that the trial court acted outside the bounds of the law in refusing to permit him to ascertain the facts and adequately present his challenge to the proposed approval. The following outlines the sequence of events.

September 30, 1994 — MHP reported net operating losses for the quarter, and for every quarter thereafter.

March 31, 1997 — MHP reported net worth of $2,776,803 comprised of capital stock of $1,500,000 and surplus of $1,276,803. The statutory minimum surplus is either $1,500,000 or $3,000,000 depending on the type of company. OCGA §§ 33-3-7; 33-14-61.

May 12, 1997 — O'Neal was granted judgment in federal court on a jury verdict against MHP in the amount of $476,592.30 plus attorney fees and expenses, "for damages sustained as a result of the retaliation in violation of the False Claims Act."[5]

May 22, 1997 — Insurance Commissioner put MHP into administrative supervision due to the operating losses dated back to September 1994.

June 11, 1997 — Insurance Commissioner filed a petition for rehabilitation of MHP pursuant to OCGA § 33-37-11.

---

[5] According to O'Neal's brief, the trial court subsequently determined attorney fees, bringing the judgment to over $673,000. Appellee does not refute this as fact.

June 18, 1997 — MHP's federal bankruptcy proceeding was dismissed.

June 19, 1997 — The court entered an order of "voluntary rehabilitation" consented to by the Insurance Commissioner and MHP, which states that "rehabilitation is in the best interest of MHP, its members, the public, and the Commissioner" and appointing Insurance Commissioner Oxendine as the Rehabilitator pursuant to OCGA §§ 33-37-12 and 33-37-13. No mention is made of creditors, although one of the purposes of the Insurers Rehabilitation and Liquidation Act is "the protection of the interests of . . . creditors." OCGA § 33-37-1 (d). O'Neal had no notice of the proceeding which resulted in this order.

January 14, 1998 — The deputy rehabilitator and HMOG signed a three-page letter assumption reinsurance agreement for the latter's acquisition of the insured member business. No mention is made of creditors.

January 20, 1998 — The Commissioner/Rehabilitator moved the court to approve the transfer of policy obligations and certain assets to HMOG, pursuant to OCGA § 33-37-13 (e). The three-page "letter of intent" was attached. It set out the principal terms of the purported rehabilitation plan. One term required the parties "to keep confidential (except as may be required to obtain all necessary approvals for the transaction) all information . . . disclosed by the parties to each other with respect to the Transaction." The statute requires the court to assure that the plan "shall be, in [its] judgment, fair and equitable to all parties concerned." On the same day, the Commissioner/Rehabilitator sent by mail a notice to creditors and other interested parties, briefly describing the proposed agreement to transfer memberships and reserves and stating that on February 9 the court would hear the motion to approve, that the court "may" hear evidence, and that anyone failing to appear and object "shall be forever barred from raising such objections." No documents were included with the notice.

January 21, 1998 — O'Neal received the notice and, upon inquiry, learned of the motion.

January 22, 1998 — The court entered an order for a February 9 show cause hearing and prohibited discovery "except upon prior order of [the] court, entered after notice and a hearing and upon a showing of good cause." The notice included the provision that assets of MHP would be transferred to HMOG "free and clear of all claims, liens and liabilities (other than liabilities expressly assumed in the agreement)." A copy of the plan was not included. Since O'Neal was not a party, the order was not served on him.

January 23, 1998 — O'Neal filed a motion to intervene and supporting brief, pursuant to OCGA § 9-11-24 (a) (2), in order to obtain discovery and knowledgeably object to the transfer of assets from the

entity against which he had a sizeable judgment. He asserted that he learned at the supersedeas bond hearing in federal court (regarding his judgment) that "of the $3,000,000 in reserves which had existed in [MHP] before its consent to [the] rehabilitation proceedings, all but $1,200,000 had been dissipated," much of it since rehabilitation commenced. He also asserted that he had repeatedly tried, unsuccessfully, to obtain information concerning MHP's financial status and the progress of rehabilitation from the rehabilitator. He sought to intervene in order to pursue discovery to determine, among other things, what happened to the reserves he alleged had been lost. Since this was not a liquidation proceeding pursuant to OCGA § 33-37-15 et seq., O'Neal recognized that he had no right to file a claim.

January 29, 1998 — O'Neal moved for permission to conduct discovery of financial records and documents he could not get any other way because the rehabilitator and the potential transferee had control of them, and to depose persons familiar with them. He set out exactly what he sought, which were only 1997 and 1998 records. He asked for this to be done before the February 9 hearing, as the court ordered, and that if it could not be accomplished in that time, that the February 9 hearing be postponed.

February 9, 1998 — Show cause hearing. The court refused to allow intervention or discovery and took no evidence from anyone except for a copy of the final transfer agreement presented by the Commissioner/Rehabilitator and stipulated to by O'Neal. That document is not in the record on appeal. Defendant MHP was not present at the hearing, nor was the proposed transferee, only the Commissioner/Rehabilitator and creditor O'Neal and another objector, who had been president and CEO of MHP. The court orally approved the agreement.

February 12, 1998 — The court entered the approval order, prepared by the Commissioner/Rehabilitator's counsel and setting out findings of fact which included the following:

> The proposed Reinsurance Agreement is reasonable and is calculated to maximize the value accorded to creditors from [MHP's] estate, as well as offer uninterrupted coverage to [MHP's] insured members. . . .
> All interested parties were given a full and fair opportunity to present objections, evidence and arguments at the hearing. . . .
> The Reinsurance Agreement is fair and equitable to all creditors and other parties in interest. . . .

February 13, 1998 — The court entered an order denying O'Neal's motions to intervene and for discovery.

Thereafter the transfer occurred, as described above, and this appeal was taken.

Critical to O'Neal's position is what transpired at the hearing on February 9. The Commissioner's attorney described the agreement he sought to have approved, focusing on the protection which the 6,400 subscriber-members would have for their insurance if this "block of business," obligations with respect to them, and assets of the company to service them, were transferred so the purchaser could take over servicing of the subscribers for the months of January and February, co-insure them in exchange for premiums, and convert the policies to policies of the purchaser on March 1. The attorney, speaking for the Commissioner, hoped that MHP's remaining business, that of third-party administrator, might after some time of continued operation pay creditors. He expressed the opinion that if the transfer were not approved, the Commissioner would have to seek permission to liquidate MHP.

The court asked if there were any objectors, and O'Neal's attorney stepped forward to introduce O'Neal's status and present his objection and the reasons therefor. He reminded the court that he had filed two motions (to intervene and for discovery). He related that O'Neal had the large judgment and that based on O'Neal's knowledge of the company, his experience as former executive director of MHP and what he learned during the course of the federal litigation, he believed the company was then or had been (prior to appointment of rehabilitator) worth much more than the stated value of the assets.

He explained that the Commissioner had refused information to O'Neal about the proposed agreement or the financial condition of the company even though he was the principal creditor. He stated, and explained why, O'Neal believed "the evidence will show that the company should have a value today of at least six or seven million dollars based on the membership that it still retains of 6400 members." He further indicated that O'Neal believed the company was mismanaged after appointment of the rehabilitator and stated that O'Neal was present "to testify that this transaction, based on what he knows about the company, would not make sense." He also offered to present as evidence depositions from his federal case which he contended supported his representations. He pleaded for "a short delay" and opportunity for discovery "on whatever expedited basis the court would be willing to consider" to back him up or at least assure that his interest as creditor was not being unfairly jeopardized.

The Commissioner objected, challenged O'Neal's representations, and opined that O'Neal could get his judgment out of the federal case supersedeas bond (which O'Neal disputed). The Commissioner urged approval of the agreement without further delay.

The other objector who was present, also a creditor and former officer, presented through counsel's representations the basis for his objection, echoing the same concerns as O'Neal. In trying to respond to a question of the court, he stated: "Your honor, if we could hear evidence in this proceeding, we might answer some of our questions. We came here today to hear the evidence. All we've heard is a representation of counsel." The court declined to accept his documentary evidence as being unnecessary to the issue it had to decide.

Turning to O'Neal, the court expressed that the Commissioner had no obligation to him any greater than any other creditor, that he had no right to intervene, and that the reason for the proceeding was not because of creditors but for the protection of the company's insureds.

The court did not wish to delay the matter and did not hear the evidence offered but rather relied on the representations of the Commissioner's attorney for its decision to approve the agreement, without even actually reviewing it, as being in the best interest of the policyholders. The court indicated that it put trust in the Commissioner because he is a public officer. With that, the court denied the motion for discovery and the motion to intervene, suggesting to the objectors: "You all can use whatever means you have, public records, so forth, to get whatever information you need to get. I don't think the court should hold up this matter to do it." The court ended the hearing by directing the Commissioner's counsel to draw an order of approval.

The purpose of the Insurers Rehabilitation and Liquidation Act is "the protection of the interests of . . . creditors" among others and not only insureds. OCGA § 33-37-1 (d). This is to be done by the Commissioner through such actions as "(1) Early detection of any potentially dangerous condition in an insurer and prompt application of appropriate corrective measures; . . . (4) Equitable apportionment of any unavoidable loss. . . ." Id. The duty imposed on the Commissioner of Insurance by the legislature because of the nature of the industry authorizes the Commissioner to file formal delinquency proceedings, such as a petition for rehabilitation, when "the interests of policyholders, *creditors*, or the public will be endangered by delay. . . ." (Emphasis supplied.) OCGA §§ 33-37-9 (2); 33-37-3 (4).

"Creditor" is specifically defined in the Act (OCGA § 33-37-3 (3)), and there is no doubt that O'Neal comes within that category. The Commissioner may file a petition for rehabilitation on a number of grounds, including: "(1) The insurer is in such condition that the further transaction of business would be hazardous financially to its policyholders, creditors, or the public." OCGA § 33-37-11 (1). One of the grounds authorized, but not asserted in this case, is that "(10) The insurer has failed to pay within 60 days after due date . . . any judgment entered in any state. . . ." Although O'Neal's judgment was on

appeal, the inclusion of this provision in the Act as well as other prominent references to creditors in the statutory rehabilitation procedure indicates the concern of the legislature for the protection of their interests.

The rehabilitator is to "take possession of the assets of the insurer and to administer them under the general supervision of the court." OCGA § 33-37-12 (a). "Any order issued under this Code section shall require accountings to the court by the rehabilitator . . . no less frequently than semiannually." OCGA § 33-37-12 (b).

The facilitator has broad powers "to reform and revitalize the insurer," including authority to appoint, with the approval of the court, "an advisory committee of policyholders, claimants, or other creditors." OCGA § 33-37-13 (a) and (c). This again demonstrates the legislature's intention that creditors, and not only policyholders, be protected and enlightened. Not only was there no committee, but O'Neal could not even gain information.

The court's duties are also provided for in this section:

(e) If the rehabilitator determines that reorganization, consolidation, conversion, reinsurance, merger, or other transformation of the insurer is appropriate, he shall prepare a plan to effect such changes. Upon application of the rehabilitator for approval of the plan, and after such notice and hearings as the court may prescribe, the court may either approve or disapprove the plan proposed, or may modify it and approve it as modified. Any plan approved under this Code section shall be, in the judgment of the court, fair and equitable to all parties concerned.

It is evident in this case that the rehabilitator had little concern for the interests of the primary creditor of the company, in fact held him at a distance, and uninformed, and focused on the policyholders to his exclusion. The notice, the plan as described by the Commissioner's counsel, the objection to discovery, and the hasty process for approval which was set in motion by the Commissioner all demonstrate this. For that reason the creditor had to present his objection to the court and to seek to intervene so he could determine the facts underlying the proposed transfer and ascertain whether the administration of the company and the agreement to transfer was "fair and equitable" to him. In these circumstances, OCGA § 9-11-24 (a) (2) entitled him to intervene, for he was a statutorily recognized interested party whose interest was not "adequately represented by existing parties," i.e., the Commissioner/Rehabilitator or the troubled insurer. OCGA § 9-11-81.

He was also entitled, as an intervenor, to the limited discovery

he sought on an expedited basis, so that he could adequately present evidence to support what he reasonably expected to be true, in order that the court would be fully informed of the facts when it considered whether the plan was "in the judgment of the court, fair and equitable to all parties concerned." OCGA §§ 9-11-26 (b) (1); 33-37-13 (e). See also *Ray v. Dept. of Human Resources*, 155 Ga. App. 81, 84 (270 SE2d 303) (1980) (the concept of due process in all judicial proceedings which is "firmly supported" by the courts of this state embraces discovery even when special statutory procedures, such as the juvenile court proceedings in *Ray*, do not provide for it).

O'Neal was not only denied information needed to protect his interest in collecting his judgment, but he was also denied opportunity to present evidence in court to the extent he had it. This is despite the fact that the notice and the court order requiring it invited "all interested persons" to "appear and show cause" why the plan should not be approved. Instead, the court relied on the judgment of the Commissioner, related by his attorney and without any evidence except for the plan itself, that the plan met the statutory goal.

> The constitution of this state guarantees to all persons due process of law and unfettered access to the courts of this state. . . . These fundamental constitutional rights require that every party to a lawsuit . . . be afforded the opportunity to be heard and to present his claim or defense, i.e., to have his day in court. [Cits.]

*Hart v. Owens-Illinois, Inc.*, 165 Ga. App. 681, 682 (302 SE2d 701) (1983). "The fundamental idea of due process is notice and an opportunity to be heard. [Cit.]" (Punctuation omitted.) *Collins v. Morris*, 263 Ga. 734, 737 (438 SE2d 896) (1994).

O'Neal was denied due process of law as the procedure contemplated by the statute for rehabilitation of the insurance company was not carried out. The fairness of the plan to the large judgment creditor was found as fact by the trial court even though it was a vigorously contested fact and the court took no evidence to support the finding.

DECIDED MARCH 19, 1999 — ▆▆▆▆▆▆▆

*Warlick, Tritt & Stebbins, Charles C. Stebbins III, Fletcher, Harley & Fletcher, Clinton T. Harley, Richard E. Miley,* for appellant.
    *Thurbert E. Baker, Attorney General, Robert S. Bomar, Deputy*

*Attorney General, Harold D. Melton, Senior Assistant Attorney General, William W. Calhoun, Assistant Attorney General*, for appellee.