68140, 68141. IN RE M. L. G. (two cases).

DEEN, Presiding Judge.

Leon Grizzle and Helen Grizzle separately appeal from the order of the Juvenile Court of Hall County, severing their parental rights to their daughter, M. L. G. On appeal, both parents contend that the evidence was insufficient to support the termination of their parental rights.

M. L. G., who is now 9 years old, has been in foster care since late 1977. The Department of Family and Children Services (the Department) began assisting the appellants in caring for M. L. G. before the child was 1 year old. On September 9, 1977, pursuant to an emergency shelter care order, the child was placed in the custody of the Department. By consent order of October 12, 1977, the Department retained custody of the child for 60 days. Subsequently, on December 14, 1977, the court found the child to be deprived and gave custody to the Department. Custody was continued in the Department by orders dated December 19, 1979, and January 9, 1980, the latter being a consent order which extended custody until January 2, 1981. Following a hearing on January 7, 1981, on a petition to terminate parental rights brought by the Department, the court found that the child was presently deprived but denied the petition on the basis

that the deprivation was not likely to continue. That order also required Leon Grizzle to pay $20 per week for child support. The Department's second petition was heard in September 1982, and the order of severance was entered on March 7, 1983.

M. L. G. was born without a sacrum, which resulted in her paralyzed bladder. In June 1976 she underwent a cutaneous vesicotomy, a surgical procedure which re-routes urine from the bladder to empty out a stoma (or hole) in the abdomen to be collected in an ileostomy bag. Additional corrective surgery became necessary and was performed in August 1977.

Since that surgery, the child has required constant care and supervision in the maintenance, cleaning, and replacement of the ileostomy bag and in the stimulation of the stoma. If the bag, which requires emptying 3-4 times per day and daily cleaning, is not emptied as often as needed, the urine will back into the kidneys and possibly result in infection; the risk of infection also is increased by failure to clean or replace (every 3-4 days) the bag regularly. The stoma requires periodic dilating by someone placing a finger into the abdominal opening and stimulating the sphincter so that it will remain open; failure to dilate properly can result in contraction of the stoma and back pressure on the kidneys, again increasing the risk of kidney infection. Infection can damage the kidneys, and extended infection could eventually result in renal failure. While the medical testimony indicated that infection could occur even with proper maintenance and sanitary conditions, the lack thereof would increase the risk. There also was medical evidence that even though some infections developed, examination by a urologist and X-ray of the kidneys every 6 months would discover any problems and allow treatment before damage to the kidneys resulted. The child required regular medication to control the growth of bacteria, and needed to drink adequate amounts of liquids, especially fruit juices.

Leon Grizzle and Helen Grizzle have been separated most of the time during the child's foster care placement. Leon Grizzle is an alcoholic, and when intoxicated he often becomes violent. He has beaten Helen Grizzle several times, and on one occasion he struck M. L. G., knocking her off a couch onto the floor and causing the stoma to bleed. (He claimed that the child had fallen off the couch while dodging a slight disciplinary slap, but that the stoma did not bleed.) Leon's driver's license has been revoked for repeated convictions for driving under the influence. Prompted by his being ordered to seek treatment under the terms of probation, he participated in the alcohol program at the North Georgia Mental Health Center from November 1978 until October 1980; he also enrolled in the therapy sessions in August 1981 until March 1982, but his attendance during that time was poor. At the time of termination hearing in September

1982, he was not undergoing any treatment for his alcoholism, but he claimed not to have drunk anything in 6-7 months.

During the past several years, Leon, now 54 years old, has worked only sporadically. At the time of the hearing, he was living alone in a trailer park (although he hoped to find a 15-year-old girl to marry), was unemployed, and he considered himself disabled due to a back condition; he had applied for Social Security disability benefits, but the application had not yet been approved. He had never paid the court-ordered child support, at one point refusing to pay such because his visitation rights with the child had been restricted and at trial denying ever having been informed of that obligation. Caseworkers with the Department in the past had found his housing usually adequately maintained.

Leon Grizzle claimed that he knew how to and had in fact changed the ileostomy bag on M. L. G., but had never cleaned one, having disposed of the bag upon changing it; he also stated that he could hook up the night drainage bag to the child's ileostomy bag. Nevertheless, he had earlier indicated to one caseworker that he felt that it was inappropriate for him now to change the bag for M. L. G. because of the latter's age.

Helen Grizzle also has a past of excessive drinking, and despite her claim of not having drunk alcohol for 3 years, on May 7, 1982, while in a drunken condition she physically attacked a caseworker. (She denied this incident, explaining that she was not drunk and had only pushed the caseworker aside so that she could prevent her other child from falling off the porch.) Over the course of the last several years, the Department has provided Helen Grizzle with a variety of services, including transportation for doctor's appointments, grocery shopping, mental health clinics, parenting skills classes, and vocational counseling. These endeavors for the most part have been greeted by noncooperation. For years Helen Grizzle has failed to maintain even the minimum standards of housekeeping. At the time of the hearing, she was living with her mother and 6 others in a 2 bedroom house that was filthy, malodorous, and in disrepair, essentially the same conditions which had existed at all of her previous residences. She has persistently refused the Department's suggestion of and/or efforts to locate adequate public housing, and, instead, denies the uncleanliness of her residence. She has not worked in years, but her mother pays her $20 per month for household chores, including mowing the lawn with a swing blade; she claimed, however, to be disabled by a back condition.

Mrs. Grizzle similarly has failed to provide adequate care for M. L. G.'s medical needs. Over the past 4 years, M. L. G. has frequently returned from home visits with Helen Grizzle dirty and smelling of urine because of improper care of the ileostomy bag. The

required medication for M. L. G., sent by the foster parents, would often not be administered to the child. On at least 2 occasions, the foster mother has had to pick up M. L. G. at school on Monday, following the child's weekend stay with Helen Grizzle, and take her home to change the bag and to bathe the child.

Dr. Norman Polanski, whose doctorate was in social psychology, testified as an expert witness on abusive and neglectful families. Conceding that his profession is a soft science where subjective philosophical interplay operates, he described a condition which he identified as the apathetic futile syndrome, characterized by a pervasive conviction that nothing is worth doing. It results in an emotional numbness, a lack of confidence, an expression of anger through hostile non-compliance, non-commitment to positive standards, verbal inaccessibility to others, and an uncanny skill in spreading the sense of futility to those who attempt to assist her. Dr. Polanski noted that this syndrome is statistically associated with mothers who are involved in the most chronic and severe cases of child neglect. Another psychologist testified that M. L. G. had regressed between 1980 and 1982 in her coping skills, and suggested that the child needed more stability.

Over the years, caseworkers with the Department have emphasized the goals of minimum standards of cleanliness, stable employment, and abstinence from alcohol. The child's court-appointed *guardian ad litem* felt that neither natural parent was able to care for the child. The juvenile court concluded that clear and convincing evidence demonstrated that M. L. G. was a deprived child because of the inability of each parent to care for the special needs of M. L. G., and that that deprivation was likely to continue, and that unless the parental rights were terminated the child would suffer serious physical and emotional harm. *Held*:

OCGA § 15-11-51 (a) (2) provides that the juvenile court may terminate parental rights if "[t]he child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm . . . ." Parental rights to a child, however, may not be terminated "without some required showing of parental unfitness, caused either by intentional or unintentional misconduct resulting in abuse or neglect of the child, or by what is tantamount to physical or mental incapability to care for the child." *Ray v. Dept. of Human Resources*, 155 Ga. App. 81, 88 (270 SE2d 303) (1980); accord *Harper v. Dept. of Human Resources*, 159 Ga. App. 758 (285 SE2d 220) (1981); *Chancey v. Dept. of Human Resources*, 156 Ga. App. 338 (274 SE2d 728) (1980).

Both appellants contend that the circumstances as proved by the Department were simply insufficient to authorize a finding of unfit-

ness and termination of their parental rights. Comparing the facts of this case with those detailed in *Ray*, *Harper*, and *Chancey*, this court would probably be in agreement with that contention, were it not for the peculiar medical condition borne by M. L. G. and the concomitant special care required. As both appellants emphasize, the child is more subject to the risk of kidney infection than is a normal child, because of the ileostomy apparatus, and that infection may develop even with proper care and maintenance. However, there is no dispute that exposure to unsanitary conditions and inadequate cleaning and changing of the ileostomy bag increases that risk of infection, an increased risk to which M. L. G. should not unnecessarily be subjected. Sustained infection could result in kidney damage and perhaps even renal failure; improper care of the ileostomy not only endangers the child's health, but it could also stigmatize her socially and emotionally.

We find that the Department proved by clear and convincing evidence that Helen Grizzle and Leon Grizzle are either physically or mentally incapable of taking care of M. L. G.'s special medical needs. Despite years of encouragement and services provided by the Department, Helen Grizzle has failed utterly to maintain a sanitary living environment. On several occasions, M. L. G. returned from her weekend visits with Helen Grizzle unbathed, smelling of urine, and in need of ileostomy maintenance; on one particular occasion, Helen Grizzle had applied a plastic sandwich bag rather than the appropriate ileostomy bag. During these scheduled weekend visits, Helen Grizzle also frequently failed to administer to M. L. G. the medication prescribed to curtail the growth of bacteria, despite adequate supplies having been furnished by the foster parents. In short, she clearly has failed to provide even minimum adequate care for the child. For the past 7 years, Helen Grizzle has demonstrated that she is content with squalor, and it defies the evidence and reality even to suggest that her performance will improve. Leon Grizzle has maintained a cleaner home, but he is an alcoholic with violent propensities when intoxicated, and he currently is not seeking treatment for alcoholism nor does he appear to have made a choice to leave alcohol alone (although he claimed not to have drunk anything in several months). His professed concern over M. L. G.'s welfare was squarely contradicted by his wilful refusal to pay any child support. At the hearing, he claimed experience in changing the ileostomy bag, but not in cleaning them; prior to the hearing, he had admitted his reluctance or unwillingness now to change the bags because of the child's age.

A deprived child is defined as a child "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals." OCGA § 15-11-2 (8) (A). We agree with the juvenile court

that M. L. G. was a deprived child because of the parents' failure to provide the special care required by the child's peculiar medical condition. We also find that the Department demonstrated with clear and convincing evidence that both the natural parents were unfit because of their physical or mental inability to meet these special needs of the child, and that the deprivation of the child therefore was likely to continue. Accordingly, the court below properly ordered termination of the parental rights to M. L. G. of both Leon Grizzle and Helen Grizzle.

*Judgment affirmed. McMurray, C. J., and Sognier, J., concur.*

DECIDED APRIL 4, 1984.

*Michael E. Neidenbach,* for appellant (case no. 68140).
*J. Richardson Brannon,* for appellant (case no. 68141).
*David A. Fox,* for appellee.