**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**October 31, 2025**

# In the Court of Appeals of Georgia

A25A0879, A25A2149. IN THE INTEREST OF H. J., A CHILD (FATHER).

A25A1106, A25A2162. IN THE INTEREST OF H. J., A CHILD (MOTHER).

FULLER, Senior Judge.

These four companion appeals arise from dependency proceedings concerning the parents' medically fragile child, H. J., who has been continuously hospitalized since his premature birth in December 2023. In Cases No. A25A0879 and A25A1106, respectively, the father and the mother each appeal an order entered by the juvenile court finding probable cause to believe that H. J. was dependent following a preliminary protective hearing (PPH), and the mother also appeals the initial ex parte removal order. In Cases No. A25A2149 and A25A2162, respectively, the father and the mother appeal the juvenile court's dependency adjudication order, and the mother

appeals the juvenile court's denial of her motions to dismiss. For the following reasons, we dismiss Cases No. A25A0879 and A25A1106 as moot, and affirm the juvenile court's dependency adjudication and rulings on the motions to dismiss in Cases No. A25A2149 and A25A2162.

> On appeal from an order finding a child to be a dependent child, we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent. In making this determination we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened.

*In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018) (punctuation and footnote omitted).

*Removal.* So viewed, the record shows H. J. was born at twenty-three weeks' gestation on December 9, 2023, weighing only one pound, following delivery in a car by the mother, who received no prenatal care. Due to his extreme prematurity and resulting medical fragility, H. J. has required continuous hospitalization since birth,

and in April 2024, he was transferred to the neonatal intensive care unit (NICU) at Children's Healthcare of Atlanta Scottish Rite Hospital (CHOA).

The current proceedings began on July 25, 2024, after the hospital reported medical neglect concerns to the Division of Family and Children Services (DFCS), citing the staff's inability to contact the parents for several days to obtain consent for a tracheostomy procedure to address a life-threatening respiratory condition. The need to contact the parents was critical because, although H. J. was then too unstable to survive surgery, the procedure would need to occur quickly once his condition stabilized.

Despite the urgency of H. J.'s condition, the parents had not returned to visit H. J. since July 21, 2024, and CHOA staff indicated that the parents had only seen H. J. three times in over 100 days. On those occasions, the parents would stay for approximately two hours before the mother disappeared; the father would then go to look for the mother, but neither returned. During their visits, hospital staff had been unable to communicate with the mother "due to her being 'spaced out.'"

As a result of these circumstances, DFCS filed a dependency complaint on July 26, 2024, seeking custody of H. J. due to a lack of "proper parental care or control as

required by law and necessary for his physical, mental, and emotional health." That same day, the juvenile court issued an ex parte removal order placing H. J. in DFCS's temporary legal custody after finding "probable cause to believe [H. J.] is dependent due to neglect and abandonment by the parents."

*Preliminary Protective Hearing (PPH).* A contested PPH was held on August 7, 2024. In addition to confirming the facts in support of DFCS's dependency complaint, a DFCS investigator testified that the parents did not reside at the address they initially provided and he had been unable to determine where they resided. The investigator added that H. J.'s siblings previously had been removed from the parents' home due to the parents' ongoing substance abuse and instability issues. Furthermore, the investigator noted that the parents had not called the hospital to check on H. J.'s status.

A DFCS administrator testified that the mother tested positive for amphetamines at H. J.'s birth, and H. J. tested positive for amphetamines and methamphetamines at birth. A guardianship over H. J.'s siblings, which was put in place after their removal from the parents' home, was finalized just 11 days after H. J.'s birth. Following the hearing, the juvenile court entered an order finding

probable cause for dependency existed based on prenatal drug exposure, lack of prenatal care, minimal visitation, unavailability for medical consent, and the prior sibling case. The parents' appeals in Cases No. A25A0879 and A25A1106 followed.[1]

*Pretrial motions.* During the proceedings, the mother executed a power of attorney designating H. J.'s maternal grandmother as a medical proxy. At a September 13, 2024 status conference, the mother orally moved to dismiss the dependency petition, arguing that H. J. was not dependent because he was hospitalized and receiving appropriate medical treatment, and therefore not subject to neglect. The juvenile court declined to rule on the mother's oral motion, instead indicating that the mother should file a written motion. The mother later filed a written motion to dismiss and for immediate return of custody, arguing that the power of attorney resolved the dependency and divested the court of jurisdiction. The juvenile court ultimately denied that motion.

---

[1] Inasmuch as the juvenile court's order addressed the parents' custody of H. J., we have jurisdiction to consider these appeals. See, e.g., *In the Interest of S. J.*, 270 Ga. App. 598, 607-08 (1) (a) & (b) (607 SE2d 225) (2004).

*Adjudication of Dependency.* DFCS filed a petition for dependency, and the juvenile court held a multi-day adjudication hearing in October 2024. Relevant to its finding of dependency, the juvenile court relied upon the following evidence:

(a) *Dr. Munir Kapasi.* Dr. Kapasi, an expert witness in neonatology who treated H. J., testified that H. J. was born prematurely and he suffered a "premature lung" that was subject to scarring from being on mechanical ventilation. H. J. suffered severe complications related to his premature birth; he had difficulty feeding and required high sedation to keep him stable on the ventilator. Dr. Kapasi observed that H. J. was "very, very sick" and had been on maximum support with mechanical ventilation and oxygenation.

Dr. Kapasi stated that H. J. would benefit from having skin-to-skin contact with his parents and that he had left voicemail messages for the father indicating that H. J. liked to be held, but he was aware of only three occasions when the parents had visited H. J. over the course of five months. On one occasion, Dr. Kapasi had to insert an arterial line for H. J., and he attempted to contact the father to obtain consent for the procedure, but received no response.[2] Dr. Kapasi noted several situations where he

---

[2] Dr. Kapasi relied upon consent for a prior arterial line he received from the parents in order to perform the procedure.

was unsure H. J. would survive the night, and yet he was unable to get in touch with the parents. Dr. Kapasi also stated that the parents could visit H. J. twenty-four hours a day, except when there was a shift change for the nurses.

Dr. Kapasi added that H. J. needed a tracheostomy, but that he was not stable enough to survive the procedure. Dr. Kapasi testified that H. J. needed the procedure to be able to go home and that the parents would need at least 12 to 16 weeks of training in order to properly care for H. J. H. J. would also have a feeding tube and a ventilator at home.

(b) *Dr. Patrick Keenum*. Dr. Keenum, an expert in neonatal intensive care, reinforced Dr. Kapasi's testimony, explaining that H. J.'s condition had improved slightly but that he was still very sick. He also stressed the necessity of parental involvement, stating, "I simply need a partner who's going to be informed upon [H. J.] and make decisions in [his] best interests," especially as H. J.'s condition had been so severe that he would have discussed "withdrawal of care" had the parents been available. Dr. Keenum noted that his own contact with the parents was minimal, as he had only spoken with the parents on three occasions, and his voicemails to the father went unreturned.

Dr. Keenum hoped that H. J. could improve enough to be stable for a tracheostomy, and if the procedure went well, H. J. would need a different feeding tube within two to three weeks thereafter. In addition, after the tracheostomy, the parents would need 12 to 16 weeks of intensive training, for approximately 20 hours per week, to properly manage H. J.'s care at home. Although hospital staff would normally begin "hands-on" training at the hospital, the parents had not been present to participate in H. J.'s care. Some of the "hands-on" steps the parents could take that would be beneficial for H. J. included simply holding H. J. to calm him and moving him in order to improve his lung function.

(c) *Jessica Porter*. Porter, a licensed social worker at CHOA, testified that the parents had visited H. J. four times between his arrival at CHOA on April 11, 2024 and September 3, 2024, and that the visits lasted no more than thirty minutes each, even though the parents could have visitation at almost any time. Although the father was initially available for telephone calls, his responsiveness "tapered off" after the first two weeks of H. J.'s hospitalization at CHOA, to the point that Porter was unable to reach either parent. Porter added that CHOA was able to provide transportation assistance to the parents, but the parents never took advantage of that assistance.

Porter explained that the parents' lack of responsiveness, coupled with the limited visits, caused concerns about the parents' ability to care for H. J. upon discharge, as the necessary medical training required multiple visits to the hospital weekly.

(d) *Jazzett Carr*. Carr, a DFCS case manager, confirmed that the parents had only visited H. J. four times since his arrival at CHOA and were largely unreachable by DFCS. She testified that she offered transportation assistance to the mother on two occasions, but the mother declined. Carr identified DFCS's primary concerns as the inability to contact the parents for medical consent, their minimal visitation, and their failure to participate in the required pre-release training for H. J.'s complex medical care. She also confirmed that H. J.'s siblings had been placed in permanent guardianships due to the parents' unresolved substance abuse issues in a prior dependency case, and she had been unable to verify if the parents had completed any substance abuse or mental health treatment since then.

(e) *The Father*. The father testified that he pleaded guilty to felony drug possession in early 2024 and received three years' probation. A required substance abuse assessment had not been completed as of the October 2024 hearing, nor had he

participated in any treatment, despite acknowledging that treatment was required in the prior dependency case involving H. J.'s siblings. The father added that he was living with his mother — not H. J.'s mother — and was having trouble obtaining his driver's license. The father confirmed visiting H. J. only four times since April 2024, attributing this to lack of transportation, although he admitted he was aware CHOA offered transportation options but did not request assistance. He also confirmed that the mother had a driver's license, but that she had also been unable to visit H. J. due to her schedule and outpatient appointments.

(f) *The Mother.* The mother testified that she previously pleaded guilty to a drug possession charge and that, as part of her sentence, she was required to complete a mental health evaluation, a substance abuse evaluation, and 40 hours of community service. She reported attending substance abuse treatment several hours a day. As a result of her treatment, the mother had been diagnosed with bipolar disorder, borderline personality disorder, OCD, PTSD, clinical depression, and generalized anxiety. She indicated that she would sometimes receive mental health sessions in addition to her substance abuse treatment.

Like the father, the mother acknowledged that she had only visited H. J. four times at CHOA, compared to three times a week when he had been hospitalized in the prior facility, claiming that she could not visit more due to a lack of transportation and her anxiety about highway driving. However, she admitted that a CHOA social worker had offered transportation options, including a non-emergency bus service and ride-sharing services.[3] She disputed testimony that the hospital could not reach her, claiming she provided her number twice but received no calls, and confirmed executing the power of attorney for her mother to make medical decisions only if the parents were unreachable.[4]

(g) *Emily Bowen*. Bowen, the health information manager for a local substance abuse treatment center, testified that there was no record of attendance for the mother since June 25, 2024.

---

[3] While the mother indicated she could not ride a bus due to her social anxiety, she did testify that she would "totally do" a ride-sharing service.

[4] The mother executed the power of attorney three days before the adjudication hearing. We do not consider the effectiveness of the power of attorney.

Following the hearing, the juvenile court adjudicated H. J. dependent as to both parents. This order and the rulings on the pretrial motions to dismiss are the subject of the parents' appeals in Cases No. A25A2149 and A25A2162.

1. *The pretrial orders.*

In Cases No. A25A0879 and A25A1106, the parents argue that the juvenile court erroneously determined that there was probable cause to find H. J. dependent following the PPH. In the mother's appeal, she also argues that the juvenile court erred by admitting the siblings' dependency as evidence at the PPH and by concluding, upon its initial ex parte review, that removal was necessary. However, the juvenile court's subsequent adjudication of dependency moots the parents' arguments concerning the initial removal order and PPH. See *Beavers v. Provost*, 304 Ga. 841, 842–43 (822 SE2d 257) (2018) (holding that a subsequent adjudication and disposition order supersedes and moots challenges to an initial removal order); *In the Interest of C. E.*, 366 Ga. App. 612, 617-18 (1) (884 SE2d 22) (2023) (noting that challenge to PPH was moot following an adjudication of dependency). Accordingly, the appeals in Cases No. A25A0879 and A25A1106 are dismissed. See OCGA § 5-6-48(b)(3).

2. *The adjudication order.*

In Cases No. A25A2149 and A25A2162, the parents argue that the juvenile court committed several errors by adjudicating H. J. dependent. We address each claim in turn.

Relevant to this case, a "dependent child" is defined as a child who either "[h]as been abused or neglected and is in need of the protection of the court . . . or . . . [i]s without . . . her parent, guardian, or legal custodian." OCGA § 15-11-2(22). "Abuse" includes prenatal abuse, see OCGA § 15-11-2(2)(D), which is itself pertinently defined as "exposure to . . . the unlawful use of any controlled substance . . . which results in . . . the presence of a controlled substance or a metabolite thereof in a newborn's body, blood, urine, or meconium that is not the result of medical treatment[.]" OCGA § 15-11-2(56)(A). And as applicable in this case, "neglect" means "[t]he failure to provide necessary parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or safety[.]" OCGA § 15-11-2(48)(A).

(a) The father and mother argue that the juvenile court erred by finding present dependency because H. J. has been well-cared for in the NICU since his birth, the

parents agreed to ongoing medical treatment, and the mother signed a power of attorney designating another individual to make medical decisions for H. J. in the event they could not be reached. These arguments fundamentally misapprehend the nature of Georgia's dependency law.

Our precedent demonstrates that the dependency inquiry centers on the parents' fitness and conduct, not the child's temporary location or the quality of care provided by a third party. See *In the Interest of A. B.*, 289 Ga. App. 655, 656 (658 SE2d 205) (2008) (explaining that the relevant inquiry is whether the parents were incapable for caring for the child, not whether the child's grandmother who had "been pressed into service" was doing a good job). Crucially, present dependency can be shown by evidence that the child would be dependent if returned to the parent's care at the time of the hearing. See *In the Interest of P. D. W.*, 296 Ga. App. 189, 192 (1) (a) (674 SE2d 338) (2009).

Applying these principles, clear and convincing evidence supports the juvenile court's finding of present dependency rooted in parental unfitness. Expert testimony underscored the critical, present need for parental bonding, participation, and completion of extensive medical training for H. J.'s survival and development —

needs the parents demonstrably failed to meet through their profound lack of visitation and engagement essential for both bonding and learning H. J.'s critical care needs. This constitutes a present failure to provide necessary care and demonstrates that H. J. would be dependent if returned to his parents' care, thereby supporting the finding of present dependency. See *In the Interest of D. Q.*, 307 Ga. App. 121, 125 (704 SE2d 444) (2010) (affirming findings of dependency, then termed deprivation, based, in part, on the "special medical needs" of the children and their "parents' inability to provide for those needs").

(b) The mother also argues that there was no clear and convincing evidence of parental unfitness, or that return to the mother's custody would be contrary to H. J.'s welfare. We disagree.

To justify even a temporary removal of custody from a parent following a dependency adjudication, the dependency must be shown by clear and convincing evidence to have resulted "from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." *In the Interest of T. S.*, 348 Ga. App. 263, 269 (820 SE2d 773) (2018) (citation and

punctuation omitted). Furthermore, any order continuing placement outside the parent's physical custody requires a finding that returning the child to the parents "would be contrary to his or her welfare." OCGA § 15-11-134(b).

Here, the record demonstrates, and the juvenile court found, clear and convincing evidence of both misconduct resulting in abuse and present incapability. The evidence established that H. J. suffered prenatal abuse, having been born positive for amphetamines and methamphetamines due to the mother's prenatal drug use. See OCGA § 15-11-2(56) (defining prenatal abuse). This misconduct alone provides sufficient evidence of unfitness. See OCGA § 15-11-2(2)(D) (defining abuse as, inter alia, prenatal abuse). Additionally, the evidence showed a present incapability to care for the child, stemming from the parents' admitted recent drug possession convictions, their failure to complete required substance abuse treatment, their profound lack of visitation with their critically ill child, and their failure to begin the mandatory medical training essential for H. J.'s complex care. Given this clear and convincing evidence of present unfitness, the juvenile court properly concluded that returning legal custody, which entails the responsibility to exercise parental duties, would be contrary to H. J.'s welfare. See *In the Interest of M. L. G.*, 170 Ga. App. 642,

646-47 (317 SE2d 881) (1984) (explaining that the parents' inability to provide the special care required by the child's peculiar medical condition demonstrated their unfitness and that child's dependency was likely to continue).

(c) The mother next contends that the juvenile court abused its discretion when it found the need for continued removal and that DFCS had made reasonable efforts to prevent continued removal. We discern no error.

The mother contends that removal from the home was unnecessary to prevent neglect or abuse because H. J. has never resided with her, given that he has been hospitalized his entire life. See OCGA § 15-11-133 (providing circumstances under which a child "may be removed from his or her home"). However, as addressed above, present dependency may be proved "by showing that, if the child were returned to the [parent] at the time of the hearing, . . . [the child] would be [dependent]." *In the Interest of P. D. W.*, 296 Ga. App. at 192 (1) (a). And as held previously, the juvenile court found by clear and convincing evidence that the mother lacked the necessary training to care for H. J.'s medical issues. This finding means H. J. would be dependent if placed in the mother's care at the time of the hearing.

Therefore, continuing the removal of legal custody from the mother was necessary regardless of H. J.'s physical presence in the hospital.

The mother also alleges that the juvenile court failed to consider the availability of reasonable alternatives prior to removing H. J., in accordance with OCGA § 15-11-133(g).[5] However, the adjudication order details DFCS's efforts to consider reasonable alternatives to removal, in particular, by engaging with hospital staff to ensure that H. J.'s needs are met, and by offering transportation so the parents could visit with H. J.

(d) Finally, the mother argues that the adjudication order contained insufficient findings of fact and conclusions of law.[6] As pertinent here, she asserts that the findings

_____

[5] OCGA § 15-11-133(g) requires in pertinent part that "prior to authorizing the removal of a child from his or her home . . . the court shall consider whether there are reasonable alternatives to the removal of the child and placement of the child in foster care[.]"

[6] We deem abandoned the mother's conclusory assertion that the juvenile court's findings of fact and conclusions of law in its order regarding the September 13, 2024 status review hearing and the order regarding the October 3, 2024 motions hearing were "ambiguous, inaccurate, and lacking in establishing the basis for the juvenile court's rulings," and therefore "ineffective." See Ga. Ct. App. R. 25(d)(1) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned."); *In re Estate of Burkhalter*, 354 Ga. App. 231, 237 (2) (a) (840 SE2d 614) (2020) (finding argument abandoned where appellant "failed to provide a discernable argument to support his bare assertion" that the

18

"were not individualized for [her] in this particular situation specifically with H. J. being found dependent based on abandonment due to substance use, mental health issues, and H. J.'s medical needs." This argument is belied by the court's nine-page order which contains detailed findings of fact derived from the testimony of each key witness, including that the parents have only visited H. J. four times within six months for a total of no more than two hours, with the longest visit lasting approximately thirty minutes; that the parents have failed to begin learning how to care for H. J.'s medical needs and lack reliable transportation; and that the parents have failed to communicate with hospital staff since H. J. was transferred to the NICU. In addition, the order explicitly finds dependency by clear and convincing evidence, and explains how the parents' lack of medical training, stability, and communication prevent them from visiting the child and learning how to care for him. This detailed recitation is legally sufficient.

3. *The mother's motions to dismiss*.

---

court's findings were unsupported by evidence).

19

The mother argues in Case No. A25A2162 that the juvenile court erred by failing to grant her motions to dismiss. Pretermitting whether these claims are moot in light of the adjudication order, they are without merit.

The juvenile court did not err by failing to grant the oral motion to dismiss. Uniform Juvenile Court Rule 9.3 requires pretrial motions to be "made in writing . . . before the hearing at which the motion will be considered, unless otherwise permitted by the court." The court did not err by failing to grant a motion that was not in the proper form. See *In the Interest of C. W.*, 345 Ga. App. 750, 752 (815 SE2d 123) (2018) (reversing grant of oral motion to dismiss as the motion was not in the proper form, as required by former Uniform Juvenile Court Rule 7.9, which is now Rule 9.3).

The juvenile court also did not err by denying the written motion to dismiss, which argued that the power of attorney resolved the dependency and divested the court of jurisdiction. As established above, the dependency inquiry focuses on overall parental fitness. While the power of attorney addressed the discrete issue of medical consent, it did not remedy the broader, underlying issues of parental unfitness stemming from the mother's profound disengagement with H. J., her lack of

communication with H. J.'s medical team, her instability, or her failure to undertake the necessary medical training. Accordingly, this argument is without merit.

*Judgments affirmed in Cases No. A25A2149 and A25A2162. Appeals dismissed as moot in Cases No. A25A0879 and A25A1106. Dillard, P. J., and Mercier, J., concur.*